THE CITY OF EAST ORANGE, A MUNICIPAL CORPORATION OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DWIGHT R. G. PALMER, COMMISSIONER, STATE HIGHWAY DEPARTMENT, STATE OF NEW JERSEY, JOHN A. KERVICK, TREASURER, STATE OF NEW JERSEY, AND NEW JERSEY HIGHWAY AUTHORITY, A BODY POLITIC AND CORPORATE UNDER THE STATUTES OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued September 29, 1965—Decided June 9, 1966.

*Mr. Alan B. Handler,* First Assistant Attorney General, argued the cause for defendants-appellants Dwight R. G. Palmer and John A. Kervick (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Handler,* of counsel and on the brief).

*Mr. Adrian M. Foley, Jr.* argued the cause for defendant-appellant New Jersey Highway Authority (*Messrs. Pindar, McElroy, Connell & Foley,* attorneys; *Mr. Theodore W. Geiser,* of counsel; *Mrs. Sonia Napolitano,* on the brief).

*Mr. Norman E. Scull* argued the cause for plaintiff-respondent (*Mr. William L. Brach,* attorney; *Mr. Scull,* of counsel and on the brief).

The opinion of the court was delivered by

HALL, J. Does liability for local property taxes remain, with respect to real estate acquired by the State of New Jersey or New Jersey Highway Authority by voluntary conveyance for public highway purposes, from the date of acquisition until the end of that tax year, despite the general tax exempt status of such property in the hands of the State or the Highway Authority?

This thorny question, with implications broader than its precise limitations, is presented in the following framework. The State, through its highway department, is in the course of constructing the East-West Freeway in Essex County. In the city of East Orange the road will connect with the Garden State Parkway, a toll highway built and operated by the New Jersey Highway Authority as an agency of the State. Both entities have found it necessary to acquire many privately owned parcels of improved real estate situated within the route of the freeway and the interchange in the city. Both have declined to recognize any liability of the properties so acquired for the taxes levied against them by the city for the year of acquisition beyond a *per diem* proration thereof to the date of conveyance and have refused to pay the balance of such levies.

The State takes the view that its sovereign immunity from local taxation on its real property, now defined by statutory tax exemption provisions, especially *N. J. S. A.* 54:4–2.1, 2.2 and 3.3, is so strong, absent clear legislative direction to the contrary, that it is to be construed to take effect as of the

moment of acquisition, insofar as such subsequent taxes are concerned. The Highway Authority primarily rests on the exact language used in the tax exemption section of the statute creating it, *N. J. S. A.* 27:12B–16, urging that thereby its position is even more solid than that of the State itself.

The State claims further support from a tax apportionment provision first adopted as a section of the present general tax act, *L.* 1918, *c.* 236, § 514, *p.* 871. Its current form, *N. J. S. A.* 54:4–56, may well be quoted in full at this point:

"Upon the sale and transfer for a valuable consideration or the acquisition through eminent domain or similar proceedings of any real estate in this state, unless otherwise provided in a written agreement between the seller and purchaser or the parties in said proceedings or unless otherwise expressly stipulated, the seller or owner of property to be acquired shall be liable for the payment of such proportion of the taxes for the current year upon the property to be conveyed or so acquired as the time between the previous January first and the date of the delivery of the deed by the seller to the purchaser or the date the condemning body acquired its title bears to a full calendar year. If the amount of the taxes for the current year shall not have been determined at the time of the delivery of the deed of conveyance or the taking of its title by the condemning body, the amount of the taxes last previously assessed against such real estate shall be used as the basis for computing the apportionment herein provided."

The city, on the other hand, finds a clear enough legislative intent that liability shall remain for the balance of the taxes for the year of acquisition from an over-all view of the statutory structure of local tax assessment, collection and distribution and its relation to the raising of local governmental revenues. It points particularly to the provisions indicating that the taxable status of real property for the whole of a particular tax year, which is coextensive with the calendar year, is generally determined as of the assessment date—presently October 1 of the preceding year, *N. J. S. A.* 54:4–23 and 35—and to the fact that taxes become a lien on January 1 of the tax year, *N. J. S. A.* 54:5–6, even though then not fixed in amount or due. The apportionment section is said to have no application to the question.

Each side urges judicial authority for its position in a different decision. The city stresses *Jersey City v. Montville Tp.*, 84 *N. J. L.* 43 (*Sup. Ct.* 1913), affirmed o. b. 85 *N. J. L.* 372 (*E. & A.* 1913). There one municipality purchased lands in another, after the then assessment date, for a public purpose which would bestow subsequent tax exemption. The court denied the purchasing entity's claim to exemption for any portion of the tax assessed for the year of acquisition on the thesis that taxability for the entire year is determined by the status on the assessment date.

The State relies on *Borough of Edgewater v. Corn Products Refining Co.*, 136 *N. J. L.* 664 (*E. & A.* 1948), which grew out of a controversy, between the owner-condemnee and the municipality in which the property was situated, over the distribution of the condemnation award in an eminent domain action by the United States in the federal court. The taking occurred after the assessment date. The Court of Errors and Appeals in effect held, primarily on the basis of the apportionment statute previously quoted, that the municipality was entitled to receive out of the award taxes for the year of acquisition only to the extent of the prorated portion thereof from January 1 to the date of taking. The State accordingly suggests that the effect of the apportionment statute, enacted since the decision in *Montville*, is to modify the holding of that case.

East Orange sought a resolution of the dispute by commencing the instant action in 1963 against the State Highway Commissioner, the State Treasurer and the Highway Authority. The complaint spoke in general terms of the acquisitions in that year, with illustrative reference to one specific parcel purchased by the State on February 4. It alleged that the ratables taken or to be taken for highway use within the city in 1963 aggregated approximately $12,000,-000 and that the taxes thereon of which payment was refused amounted to about $600,000, which sum had been included for purposes of the city's 1963 budget, its tax rate and the proportion of county taxes which it had to pay to that entity.

The relief sought was a declaratory judgment that properties so acquired remained subject to tax liability from the date of acquisition to the end of the year as well as a mandatory direction to the defendants to pay the taxes on such parcels for that period.[1]

The controversy was determined in the Chancery Division on cross-motions for summary judgment. In an opinion reported in 82 *N. J. Super.* 258 (1964), the court held that, as a trial tribunal, it felt compelled to follow *Jersey City v. Montville Tp., supra,* because here, as in that case, the tax-exempt owner acquired title by delivery of a deed, as distinguished from the situation where the acquisition was by means of eminent domain proceedings bringing into play the alleged thesis of *Edgewater.* Judge Herbert indicated, however, an appropriate feeling of unsoundness in having the result turn on the method of acquisition. He also decided against the further defense of the state officials that the suit amounted to an action against the State and so not maintainable under the immunity doctrine. This position was not asserted by the Highway Authority since the statute creating it expressly authorized the agency "to sue and be sued." *N. J. S. A.* 27:12B–5(d).

The judgment declared "that an obligation exists to pay all taxes on all lands acquired by purchase" by the State and the Authority "for the period of time between the date of acquisition of title to such lands and the end of the full calendar year following the last assessment date on which taxable ownership still prevailed" and ordered the defendants "to pay, discharge, and satisfy all unpaid property taxes with interest to date of payment with regard to each property acquired * * * for which an obligation exists to pay said

---

[1] The city also sought an injunction against the demolition of buildings on the acquired parcels without first obtaining permits therefor as required by a municipal ordinance. Permits apparently would not be issued without payment of taxes for the full year. The trial court held that the State and the Authority were not subject to such an ordinance. The city's cross-appeal from that portion of the disposition has been withdrawn.

taxes as aforesaid * * *" The defendants' appeal to the Appellate Division was certified on our motion before argument there. *R. R.* 1:10–1(a).

As our earlier summary of the views of the parties indicated, all agree that tax liability for the balance of the year of acquisition by an exempt governmental entity is a subject within the sphere of permissive legislative action. We are satisfied that no presently existing enactment precisely settles the matter and that the legislative intent must therefore be determined inferentially.[2]

At this point we should refer again to Judge Herbert's uneasiness in feeling constrained to distinguish between pub-

[2] The question is not peculiar to New Jersey and has been the frequent subject of judicial consideration in other states. See Annots., "Rights in respect of real-estate taxes where property is taken in eminent domain," 45 *A. L. R.* 2d 522 (1956) ; "Acquisition by state or other governmental body of title to land, otherwise than at tax sale, as affecting prior tax lien on land, or validity of sale for such taxes," 158 *A. L. R.* 563 (1945). The results reached in other jurisdictions are not of great assistance by reason of differing constitutional and statutory provisions, taxing schemes and revenue raising methods. Illinois has recently solved the question under its taxing system, after considerable litigation involving the subject, by the passage of *Ill. Rev. Stat.* 1961, *chap.* 120, *par.* 509.1 which provides that whenever real property is transferred to tax-exempt use by any means, the exemption shall commence on the date of the vesting of title. See *Public Building Commission of Chicago v. Continental Illinois Bank & Trust Co.*, 30 *Ill.* 2d 115, 195 *N. E.* 2d 192, 194 (*Sup. Ct.* 1963).

The currently existing New Jersey Eminent Domain Revision Commission (1962), created by *L.* 1962, *c.* 50, *N. J. S. A.* 1:16–9, *et seq.*, deals with the question in its report of April 15, 1965. It recognizes that the issue has not been settled and that condemning bodies presently vary in their practical treatment of it. (at *pp.* 37–38). Legislation is recommended to provide

"* * * that when title [other than certain right of way easements] is acquired by a condemning agency, whether through settlement, or as a result of prosecution of proceedings, the owner shall be chargeable for the pro rata share of taxes during the period of his ownership or possession and that as additional compensation to the owner, the condemning agency shall pay to the municipality for the account of the owner, the taxes for the balance of the year. The municipality thereby receives payment of the taxes for the entire year." (at *p.* 38) See 1966 *Senate Bill* 234, Art. IX, which is apparently designed, at least in part, to implement this recommendation, and *Senate Bill* 260.

lic acquisitions by voluntary conveyance and those accomplished through eminent domain. We are in thorough accord with the parties that there is no sound distinction between the two methods as far as the question before us is concerned. To hold that a property remains liable for taxes for the balance of the year of acquisition when it is purchased, but not when it is condemned, makes no apparent sense. Indeed, such a thesis could bring about otherwise needless resort to the "rugged remedy" of condemnation, contrary to the universally accepted policy of encouraging acquisition through voluntary conveyance. See *New Jersey Turnpike Authority v. Washington Township,* 16 *N. J.* 38, 43 (1954). What we have to say in this portion of the opinion will, therefore, be generally applicable to both methods of public acquisition.

In seeking the legislative intent, we should constantly keep in mind Judge Herbert's apt analysis that the question is "[s]trictly speaking, * * * not one of tax exemption. The city agrees with the general proposition that the State and the Highway Authority are exempt from taxation on land acquired for this project; the controversy here is over the date on which exemption begins." 82 *N. J. Super.,* at *p.* 261. So any rule that exemptions in favor of governmental entities should be liberally construed is of no appreciable assistance. See *Walter Reade, Inc. v. Dennis Township,* 36 *N. J.* 435, 440 (1962).

We disagree with the Authority's contention that the answer as to it is found in certain language of the tax exemption provision of its enabling act, *N. J. S. A.* 27:12B–16. The section reads:

"The exercise of the powers granted by this act will be in all respects for the benefit of the people of the State, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions, and as the operation and maintenance of projects by the Authority will constitute the performance of essential governmental functions, *the Authority shall not be required to pay any taxes or assessments upon any project or any property acquired or used by the Authority* under the provisions of this act or upon the income therefrom, *and every project and any property acquired or*

*used by the Authority* under the provisions of this act and the income therefrom, and the bonds or notes issued under the provisions of this act, their transfer and the income therefrom (including any profit made on the sale thereof) *shall be exempt from taxation."* (Emphasis added)

The Authority reasons in its brief that it thereby stands in a better position than the State itself:

"Thus the Legislature has provided not only that the property devoted to the statutory purposes shall be exempt from taxation, but that in no event shall the Authority be required to *pay* any taxes or assessments on property so used. Such language is in sharp contrast to the statutory language granting tax exemptions to property used for public purposes by the State of New Jersey and its political subdivisions as contained in R. S. 54:4–3.3, N. J. S. A. There is no provisions in Title 54 relieving such political entities of any and all obligation to pay taxes. It merely confers on property used by these entities for public purposes an exempt status, leaving open, of course, the question of the date on which such exemption attaches. No similar question is left to adjudication by the provisions of the Highway Authority Act quoted above."

It is inconceivable to us, however, that the Legislature meant to give such a toll-charging entity more favorable treatment. This court indicated in *New Jersey Turnpike Authority v. Washington Township,* 16 *N. J.* 38 (1954), a case involving another agency having an identical tax exemption section, *N. J. S. A.* 27:23–12, that such provisions were not to be so construed. The purpose of the language relied on was rather, we believe, to make absolutely certain that the active property and income of this self-liquidating revenue facility would possess tax exemption to the same extent as if it were constructed and operated by the State itself, a status which the *Washington Township* case holds the Authority would not otherwise have because such entities are not the *alter ego* of the State. 16 *N. J.,* at *pp.* 46–47. *Walter Reade, Inc. v. Dennis Township, supra* (36 *N. J.* 435), does not aid the Authority. There we held only that the Authority's tax exemption provision was intended to exempt its service area properties from local taxation even when assessed against a private party operating them under authorized con-

tract. Indeed, the Authority's proposition logically proves too much for the meaning it ascribes to the verbiage would seem to require a cancellation of tax liens for prior years on property it acquired, especially where the amount of those liens entered into a negotiated purchase price, a position which it disavows. We are convinced that the statutory statement that the Authority shall not be required to pay any taxes was not intended to refer to levies covering the balance of the year of acquisition and that it stands on the same plane as the State itself in this regard.

Nor, considering the question at this single level, can we agree with the argument that the general constitutional and statutory exemption provisions point to the conclusion that tax exemption in the case of a state acquisition is intended to begin at the very moment thereof. We fail to see how the general tax clause of the 1947 *Constitution, Art.* VIII, § I, *par.* 1, or the provision in the following paragraph thereof that tax exemption may only be granted by general laws and that all existing exemptions shall continue until otherwise provided by law (with certain unchangeable exceptions), have any bearing at all. Likewise we find no indication of intent as to the time when exemption shall take effect in the general statutes dealing with the taxation and exemption of state owned property. The State's argument to the contrary is based on the principle that while "[t]he state may, if it sees fit, subject its property, and the property owned by its municipal divisions, to taxation, in common with other property within its territory, * * * [s]uch property is, * * * by implication, excluded *.* * *, unless there is a clear expression of intent to include it." *Trustees of Public Schools v. City of Trenton,* 30 *N. J. Eq.* 667, 681 (*E. & A.* 1879). It is said that *N. J. S. A.* 54:4–2.2, specifically exempting lands held by the State for highway purposes, and the general exemption of property of the State not otherwise made subject to taxation, found in *N. J. S. A.* 54:4–3.3, evidence an intent to preclude liability for the remaining taxes on highway lands in the year of acquisition. The contention is at least weakened

by the affirmative thesis of taxability in force since *L.* 1935, *c.* 250, *N. J. S. A.* 54:4–2.1, that

"[a]ll lands, except riparian lands and lands excepted by section 54:4–2.2 of this Title, owned or held in trust for the State, which are used or to be used for State purposes, whether the title thereto be in the name of the State, or any board, commission or corporation, shall be taxed in the municipality wherein such lands are situate, for municipal and local school purposes, unless the aggregate area of such lands is less than nine per centum (9%) of the total area of the municipality after deducting from the total area of the municipality * * *"

lands held or used for certain specified purposes. The main difficulty with the argument is, however, that again these statutory provisions do not reach the question before us. General or specific exemption statutes deal only with what property shall be free from tax and not with the mechanics of when or how the exemption shall become effective.

Intent as to the effective date of exemption is instead to be inferred, we think, from the fundamentals of New Jersey's property tax and local government finance system. Although the basic scheme is of more ancient origin, its current form principally derives from *L.* 1918, *chapters* 236 and 237, now found with subsequent changes in *N. J. S. A.*, Title 54, chapters 4 and 5.

All levels of government may levy taxes on real property. The State itself does not currently exercise the power, but such imposts are the chief source of revenue for counties, municipalities, coterminous and regional or consolidated school districts and various other taxing districts. The municipality is, however, the collecting and distributing agent for the taxes levied for the benefit of all entities. The tax year is the calendar year and all events in the levy and payment process take place within that year except the assessment date, which is October 1 of the preceding year. One tax bill is rendered for each parcel of real property in the municipality. The tax rate for each municipality in a county is fixed by the county board of taxation. Each entity entitled to raise rev-

enue in a municipality certifies to the board the amount which must be raised by property taxation for its operations that year. Previously, by January 10, the respective municipal assessors have delivered to the board their lists valuing each taxable parcel, which are reviewed, corrected and equalized by the board. The revised total thereof for each muncipality is then divided by the total amount to be raised by taxation in that municipality to produce the municipal tax rate.

Multiplication of the assessed valuation of each parcel by the rate determines the amount of the year's tax for that parcel, which becomes due in four installments on February 1, May 1, August 1 and November 1. (Since the rate has not been fixed by the due dates of the first two installments, the amounts payable thereon are computed on the basis of the previous year's levy.) The municipality must remit to the other entities for which it is acting as collecting agent their shares of the total levy and, in some instances at least, this must be done without regard to actual collections. There has been no personal liability on the owner for real property taxes in this State since 1918. The levy is against the property only and may be enforced in the event of nonpayment solely by sale and foreclosure of the tax lien in a subsequent year. Since *L*. 1944, *c*. 247, this lien for the amount of the levy attaches to each parcel on January 1 of that tax year, *N. J. S. A*. 54:5-6, even though the taxes are not then fixed in amount or due, and is "a first lien on such land and paramount to all prior or subsequent alienations and descents of such lands or encumbrances thereon, except subsequent municipal liens." *N. J. S. A*. 54:5-9.

The tight relation between the raising of necessary governmental revenues and the taxable properties on the rolls is most obvious from this panoramic view of the New Jersey system. The annual finances of each taxing entity sharing in the municipal levy are dependent upon tax revenues computed on the basis of the taxable real property on the assessor's list. Mid-year cancellation of tax liability by reason of a property so listed becoming exempt during the year would result, as in

the present situation of East Orange, in a major dislocation and an unfair burden to the remaining taxpayers of the municipality, for the tax revenues lost thereby to the municipality itself must be made up in the end by those taxpayers. It may also be true that there is no subsequent adjustment by reason of mid-year exempt acquisitions even with respect to the shares of the other entities for which the municipality is the agent for collection comparable to the relief given in the case of changes in assessments during a tax year occasioned by appeals, correction of clerical errors and the like. See *N. J. S. A.* 54:4–49(c).

But more important, to relieve property which becomes exempt in mid-stream from the taxes for the balance of the year, at least where the acquisition is by an entity other than the municipality itself or a coterminous taxing district, would put the burden represented by those taxes solely on those who own property in the municipality rather than on all those in the larger area sharing in the public benefit—here highways open to the use of the people of the whole State—, as would be the case if the acquiring public entity were held responsible for the remaining taxes as part of the cost of acquisition. Conversely, even if the acquisition were by the municipality or a coterminous taxing district, cancellation of tax liability for the balance of the year can, to some extent at least, deprive other taxing entities, for which the municipality is the collector, of the timely availability of their shares of such taxes and thus impose the burden of a purely local acquisition upon the people of a larger, non-benefiting area. See *District of Columbia v. Sussman,* 352 *F.* 2d 683 (*D. C. Cir.* 1965), where, on similar reasoning, in a case of condemnation by the United States of property in the District of Columbia after the assessment date, the court held in effect that liability was to remain on the condemnor for District taxes for the balance of the year of acquisition, even though such taxes had not become a lien at the time the lands were taken. As Judge McGowan's cogent opinion points out, while the District must, and practically can, "take account of the likelihood

that some property on the local tax rolls one year will be exempt the next * * * and that consequent year-to-year variations in the tax base must necessarily be borne by the District taxpayers * * *, there is no evidence * * * that Congress intended that the District taxpayers should bear the additional, unforeseeable burden that would result from mid-year cancellation of tax liability * * *", a result which would "prevent the burden of this tax liability from falling where it belongs—on all the people of the United States, and not simply on those who live in the District of Columbia." 352 *F. 2d*, at *pp*. 686, 687.

On principle alone, therefore, we cannot attribute to the Legislature the intention to bring about such an inequitable result or impose such a burden on the taxpayers of the locality where the acquired property is situate, absent specific enactment so requiring.

Indeed, this thesis is the foundation of the decision in *Jersey City v. Montville Tp., supra,* which established the rule, as we have said, that taxable status, as well as valuation, is to be determined as of the assessment date. Justice Swayze there stated, speaking with reference to the timetable then in effect:

"The scheme obviously requires that the amount of the ratables and the rate of taxation shall be fixed before October 1st [The then date set for the return of completed tax duplicates to the municipal collectors by the county board after the fixing of the rate]. This is impossible if the amount of the ratables is subject to variation by reason of a change of ownership after October 1st, which shall render the property exempt from that tax levy. The fact that the property is exempt at some time before the tax is payable [December 20th] is not important. Under our statutory scheme, taxes are imposed not for a particular year, calendar or fiscal, but on a particular day * * * That day in the case of the general property tax is May 20th [the then assessment date]. On May 20, 1911, the property in question was taxable to the Jersey City Water Supply Company, and there was no exemption." (84 *N. J. L.*, at *pp*. 44–45)

While, by reason of statutory amendments in recent years, the assessment date criterion is not as absolute as it once was,

the changes, with one exception, favor greater rather than less taxability because of events occurring after the assessment date. (Perhaps the changes were induced by the fact that the assessment date is now placed so far ahead of the January 1 beginning of the tax year and the May 1 fixing of the tax rate. It was moved by the 1918 act from May 20 of the tax year, 4 *C. S.* 5085, to October 1 of the preceding year, *N. J. S. A.* 54:4–23 and 35.) The exception to greater taxability is where material depreciation in value of a building by intentional act or casualty occurs between the assessment date and January 1. In that situation, if notice is given to the assessor before he closes his lists and delivers them to the county board on January 10, the assessed value shall be determined as of January 1. *L.* 1945, *c.* 260, *N. J. S. A.* 54:4–35.1. Changes running the other way include provisions for added assessments with respect to buildings erected or improved after the assessment date and municipal property later sold to private owners, *N. J. S. A.* 54:4–63.2 and 63.3, as well as property exempt on October 1st which thereafter comes into the hands of a non-exempt owner, *N. J. S. A.* 54:4–63.26 through 63.30. (The latter enactment is contrary to the holding in *Jabert Operating Corp. v. City of Newark,* 16 *N. J. Super.* 505 (*App. Div.* 1951), which concerned taxes for the year prior to the effective date of the enactment.) No legislative change has been made with respect to the converse situation where property is non-exempt on the assessment date but is transferred to an exempt use thereafter. *Shelton College v. Borough of Ringwood,* 48 *N. J. Super.* 10 (*App. Div.* 1957), held that property remained taxable for the balance of the year where the transfer to an exempt educational institution occurred after the beginning of the tax year, and pointed out that the rule of *Montville* had not been legislatively disturbed except with respect to property losing its exempt status after the assessment date.

We do not think that the apportionment section, *N. J. S. A.* 54:4–56, or *Borough of Edgewater v. Corn Products Refining Co., supra* (136 *N. J. L.* 664) indicates a contrary view.

Neither reaches the question before us and we cannot conceive that they bear on its resolution.

The apportionment provision first appeared in the 1918 tax act. *L. 1918, c. 236,* § *514.* In the original form it was limited to sales and imposed liability on the seller for current year taxes prorated to the date of delivery of the deed unless the parties had specified otherwise. However, it was positively stated that such liability "shall exist only between him, his heirs, executors, administrators and assigns, and the purchaser and his heirs, executors, administrators and assigns, and shall in no way affect the lien of the municipality or taxing district for unpaid taxes upon the real estate." The statute made no mention of taxes for the balance of the year. Thus, the municipality neither acquired any additional right nor lost that which it previously had to collect whatever taxes it then was or thereafter became entitled to out of the property by enforcement of the lien. (At that time the lien did not accrue until December 1 of the tax year. *L. 1918, c. 237,* § *6.*) Indeed the inclusion of this kind of a provision in "an act for the assessment and collection of taxes" seems somewhat strange. It appears likely that its purpose was to do away with the effect of previous cases which held that, where taxes had not been apportioned at the closing of title and a grantee was later required to pay the full year's assessment to protect his property from the lien, he had no right of recovery against his grantor for the *pro rata* portion covering the latter's period of ownership earlier in the year. See, *e. g., Bradley v. Dike,* 57 *N. J. L.* 471 (*Sup. Ct.* 1895).

The amendment of the section to the present form, *N. J. S. A.* 54:4–56, which extended its application to eminent domain acquisitions, took place through *L. 1933, c. 334,* as a result of the decision in *Empress Manufacturing Co. v. City of Newark,* 109 *N. J. L.* 131 (*E. & A.* 1932). In that case, Newark condemned the plaintiff's property and sought to deduct from the award a sum representing taxes for the year of acquisition prorated to the date when the city took possession. The court denied the right. It said that the amount

of taxes so claimed was not a lien because possession was taken before the lien date of December 1. (If the sum were a lien, it would have been payable from the award pursuant to the eminent domain act, now *N. J. S. A.* 20:1–15 and 25.) The court further held that the apportionment section did not aid the city since on its face it was confined to sales and could not apply to acquisitions by condemnation. Taxes for the balance of the year were not claimed.

The 1933 amendment, as expressed in the statement annexed to the bill, was designed simply to overcome the effect of the *Empress* case. It extended compulsory *pro rata* apportionment to eminent domain acquisitions for, as the statement said, a municipality would otherwise be deprived of taxes to the date of acquisition "because the same do not become a lien before December first." (This reason no longer exists since the lien date was advanced from December 1 to January 1 of the tax year by *L.* 1944, *c.* 247, *N. J. S. A.* 54:5–6.) The change did delete the previously quoted language to the effect that the liability imposed on a seller thereby existed only as between him and the purchaser and did not affect the municipality. We attach no significance to the deletion—the language was not strictly appropriate to a condemnation situation — in view of the clear statement of purpose annexed to the bill. But it is noteworthy that the amended section again made no mention of the remainder of the year's taxes.

We can therefore only conclude that *N. J. S. A.* 54:4–56 is still confined to the matter of taxes prior to the date of conveyance or acquisition by condemnation. The section does not impose any personal liability on the former owner or condemnor *vis-a-vis* the municipality for such prorated taxes. All taxes are still borne by the land in the first instance. In the case of either sale or condemnation, the provision protects the grantee or condemnor *vis-a-vis* the seller or condemnee against responsibility for taxes covering that portion of the year prior to acquisition. In the case of condemnation, it also assures the municipality that such taxes will be satisfied

out of the award. Seemingly both results would follow even without the statute since the lien date was moved in 1944 to January 1 of the tax year. Conversely, the section also inferentially gives recognition to the established principle of fairness that the prior owner of land "shall be called upon to contribute to the year's revenues only a sum commensurate with the length of time the land has been held in that year * * *" *Commissioner of Internal Revenue v. Coward,* 110 *F. 2d* 725, 728 (3 *Cir.* 1940). See *Milmar Estate v. Borough of Fort Lee,* 36 *N. J. Super.* 241, 244 (*App. Div.* 1955); *District of Columbia v. Sussman, supra* (352 *F. 2d,* at p. 686). What the apportionment statute does not deal with is the question whether liability for taxes for the balance of the year of acquisition remains when property passes to a tax-exempt entity. See *Shelton College v. Borough of Ringwood, supra,* 48 *N. J. Super.* 10, 12 (*App. Div.* 1957); *New Jersey Highway Authority v. Henry A. Raemsch Coal Co.,* 40 *N. J. Super.* 355, 360–361 (*Law Div.* 1956).

▮ *Borough of Edgewater v. Corn Products Refining Co., supra* (136 *N. J. L.* 664), actually holds only that taxes on condemned property for the remainder of the year of acquisition cannot be charged to the former owner and deducted from the award. The condemnation involved there was by the United States in the federal district court. It is elementary that federal law and not that of the state of situs controls immunity of federal lands from state taxation. *United States v. City of East Orange,* 78 *F. Supp.* 371 (*D. N. J.* 1948). The federal condemnation statutes provide that the federal court, in distributing an award, "shall have power to make such orders in respect of encumbrances, liens, rents, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable." 40 *U. S. C. A.* § 258a. This provision is interpreted to mean that state taxes will be paid out of the award (*i. e.,* by the condemnee) to the extent they are liens at the time and so chargeable under state law, even if the amount includes taxes from the date of acquisition to the end of the tax year. *United States v. Certain Parcels of*

*Land in Philadelphia,* 130 *F.* 2*d* 782 (3 *Cir.* 1942); *Collector of Revenue v. Ford Motor Co.,* 158 *F.* 2*d* 354 (8 *Cir.* 1946).[3]

In *Edgewater,* the federal taking took place in May 1942. (The lien date was then December 1.) The owner, Corn Products Refining Company, had previously paid the taxes for the first half of that year. The municipality claimed the balance of the year's levy, not from the United States as condemnor, but out of the award, *i. e.,* from the fair market value of the property as of the date of taking and thus out ·of the condemnee's pocket. The federal district court refused to allow the claim, holding, however, that the government took the property subject to the cloud of a presently unenforceable but continuing inchoate lien therefor. It relied on *United States v. State of Alabama,* 313 *U. S.* 274, 61 *S. Ct.* 1011, 85 *L. Ed.* 1327 (1941), which had so decided where the federal acquisition was by purchase rather than condemnation. *United States v. 25.936 Acres of Land,* 57 *F. Supp.* 383 (*D. N. J.* 1944). On the appeal of the United States, the Circuit Court of Appeals reversed, holding that, since federal condemnation is strictly *in rem,* the government must receive the entire title free from any cloud.[4] It found that whether the municipality

---

[3] It may be noted that the reason given for the advancement of the lien date from December 1 to January 1 in the statement to the bill which became *L.* 1944, *c.* 247, was that federal court decisions (presumably *e. g., United States v. Parcels of Land,* 57 *F. Supp.* 381 (*D. N. J.* 1943)) had held that only New Jersey taxes which had already become due or were then a lien need be paid from a federal condemnation award and as a result New Jersey municipalities had lost tax revenues on which their current budgets were dependent.

[4] In so holding, the court was saying that state taxes could not, as a matter of law, be imposed upon the United States for any portion of its period of ownership resulting from condemnation. But *cf. District of Columbia v. Sussman, supra,* 352 *F.* 2*d* 683, where it was recently held that as a matter of common law principle District of Columbia taxes for the balance of the year of acquisition through condemnation by the United States should be satisfied by the condemnor, even though not strictly a lien, by means of additional damages in that amount to the condemnee beyond the fair market value of the property.

had a lien for the unpaid balance of 1942 taxes under New Jersey law was a vexatious and unsettled question and remanded the cause with the direction to retain jurisdiction so that Edgewater and Corn Products could seek an answer in the state courts. *United States v. 25.936 Acres of Land,* 153 *F. 2d* 277 (3 *Cir.* 1946). The ensuing declaratory judgment action gave rise to the 1947 decision of the Court of Errors and Appeals reported in 136 *N. J. L.* 664.

Edgewater contended that the assessment date (the preceding October 1) rule of *Montville* dictated the result it claimed. The court quite properly took the view that that decision was not apposite;. while *Montville* held that the property's status on the assessment date controlled taxability for the whole tax year, it did not hold that the former non-exempt owner had to pay the remaining taxes after he had lost his beneficial interest to an exempt entity. The *Edgewater* court went on in effect to say, by way of *dictum,* that, even if the full year's taxes had become a lien at the time of acquisition (when that case was decided, the 1944 amendment advancing the lien date from December 1 to January 1 had been enacted, but was not applicable), the apportionment statute (*i. e.,* the previously mentioned principle of fairness inferentially recognized by the statute) would preclude charging the condemnee for more than a *pro rata* share to the date of acquisition. Corn Products was allowed recovery against the municipality on its counterclaim for the difference between the taxes it had paid and such *pro rata* share. The court did not hold that exemption from taxation commenced the moment of acquisition or that an acquiring tax exempt entity was not responsible for the remaining taxes of the year. Neither was in issue.

██ Therefore we conclude that there is nothing in present legislation or case law interpreting it which indicates a legislative intent that tax exemption shall take effect at the moment of acquisition. On the contrary, it is our conviction that the tax and local finance structure establishes the intention that liability should remain for the balance of the tax year regardless of whether the acquisition is by conveyance or con-

demnation, but that it should not be imposed upon the former owner.

We have said that the rule of *Montville* established the assessment date as controlling taxable status for the whole of the applicable tax year. With the assessment date now fixed at the preceding October 1, this would mean that a tax exempt entity acquiring property between October 1 and December 31 would be liable for all taxes for the year commencing the following January 1. In fact, the judgment of the Chancery Division so declared. We agree with the defendants, however, that this phase of the problem was not before the court, since a fair reading of the complaint shows it referred only to properties acquired by the defendants within the 1963 tax year. Some different considerations may be involved where the acquisition took place between October 1 and December 31 of the preceding year and we will not pass on that situation here. Practically speaking, property acquired by a tax-exempt entity during the October 1-December 31 period may easily be removed from the assessor's list of taxable property before he closes his books on January 10. The declaratory portion of the judgment should be modified accordingly.

## II.

Turning to the State's defense of sovereign immunity, we treat the question as if the suit directed against the two State officers were against the State itself. It is elementary, as we have assumed throughout, that an action of the character of this one is in fact no different, with respect to immunity, than if the State were the defendant. *Duke Power Co. v. Patten,* 20 *N. J.* 42, 50 (1955).

The thrust of the State's position is a claim of non-suability. It is summarized in the point heading: "The State of New Jersey may not be sued to establish liability for or enforce collection of municipal taxes under the doctrine of sovereign immunity." It is expressly based on the classic statement of the rule in this State, which is much too broad,

that "a suit brought against a state agency is, in fact, a suit against the state if the judgment obtained will operate to control the action of the state or subject it to liability." *Strobel Steel Construction Co. v. State Highway Commission*, 120 *N. J. L.* 298, 301 (*E. & A.* 1938).

The history in this country of the judge-made concept of the immunity of the sovereign, purportedly fashioned from the English rule, has been, in the language of Justice (now Chief Justice) Traynor of the California Supreme Court, one of

"* * * misstatement, confusion and retraction. At the earliest common law the doctrine of 'sovereign immunity' did not produce the harsh results it does today. It was a rule that allowed substantial relief. It began as the personal prerogative of the king, gained impetus from sixteenth century metaphysical concepts, may have been based on the misreading of an ancient maxim, and only rarely had the effect of completely denying compensation."

*Muskopf v. Corning Hospital District*, 55 *Cal. 2d* 211, 11 *Cal. Rptr.* 89, 90, 359 *P. 2d* 457, 458 (1961). See also the discussion by Professor Jaffe, "Suits Against Governments and Officers," 77 *Harv. L. Rev.* 1, 209 (1963).

The doctrine has, however, never been applied in New Jersey—or indeed probably anywhere else—in its literal breadth. Had it been, the judicial power long recognized here to compel the State to institute condemnation proceedings where it has taken citizens' lands, *Haycock v. Jannarone*, 99 *N. J. L.* 183 (*E. & A.* 1923), to require state officers to fulfill ministerial duties, to restrain state agencies from taking unconstitutional action, *Wilson, Attorney-General v. State Water Supply Commission*, 84 *N. J. Eq.* 150 (*E. & A.* 1915), to review by prerogative writ the actions of state administrative agencies, see *Abelson's Inc. v. New Jersey State Board of Optometrists*, 5 *N. J.* 412 (1950), and to enjoin certain types of state action, *State v. Maas & Wildstein Co.*, 83 *N. J. Super.* 211, 216 (*App. Div.* 1964), could well have been barred. The cases in which immunity was upheld have been ones where the essential aim of the litigation was to directly compel

monetary satisfaction of a private claim from the state treasury. See, *e. g., Strobel Steel Construction Co. v. State Highway Commission, supra* (120 *N. J. L.* 298) (claim for damages for breach of highway construction contract); *Gallena v. Scott,* 11 *N. J.* 231 (1953) (claim for additional back salary for reinstated state employee who had been improperly discharged where a legislative appropriation for a portion of the claim had already been made); *Duke Power Co. v. Patten, supra* (20 *N. J.* 42) (claim for return of allegedly excessive filing fees charged by Secretary of State; the court did, however, decide that the claim had no substantive merit before holding that the action could not be maintained and pointed out that procedurally it could have been asserted without being subject to the immunity bar in another fashion at an earlier date.) *Cf. Fitzgerald v. Palmer,* 47 *N. J.* 106 (1966).

This suit is of quite a different kind. It is an action by one level of government—a municipality—against another —the State—, its creator, seeking an adjudication of the respective rights and obligations of one to the other in a particular intra-governmental situation. Additionally, it seeks construction of various enactments of the legislative arm to determine whether the State has not by its own action already recognized or declared the obligation. We are convinced that a declaration of rights and obligations in such a setting should not be considered barred on any sound conception of sovereign immunity. Such an action seems to us to fall within the class of cases where a state agency sues a state officer or one state officer sues another to obtain a construction or an adjudication of a statute affecting both or a determination of their respective rights and obligations *inter se,* in which it has never been suggested that sovereign immunity interposed any barrier. See, *e. g., New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949); *Roe v. Kervick,* 42 *N. J.* 191 (1964). *Cf. Amantia v. Cantwell,* 89 *N. J. Super.* 7 (*App Div.* 1965); *Wilson, Attorney General v. State Water Supply Commission, supra* (84 *N. J. Eq.* 150).

We are not required to expressly pass upon the propriety of that portion of the judgment ordering the defendants to pay the city the taxes covered by the declaration. The Highway Authority raises no question concerning it and the State refers to it only in connection with its contention that the action is not maintainable at all. We have no doubt that both entities will conform to the declaration of obligation and make payment. See *Haycock v. Jannarone, supra* (99 *N. J. L.,* at *p.* 185). We also assume, as far as the State is concerned, that adequate funds are available through the annual blanket appropriations for highway construction, which necessarily include all costs of land acquisition. See *e. g., L.* 1963, *c.* 97, *pp.* 570–572. Furthermore, the State appears to concede that a court may order a distribution of state moneys where a legislative appropriation exists authorizing it. See *Gallena v. Scott, supra* (11 *N. J.,* at *pp.* 238–239); *Duke Power Co. v. Patten, supra* (20 *N. J.,* at *p.* 50). And also see the procedure for payment by the State of municipal taxes on certain lands owned by it. *N. J. S. A.* 54:4–2.1. It may be added that the city's tax lien of course remains on the acquired lands until payment. *N. J. S. A.* 54:5–6 and 54:5–9.

The judgment of the Chancery Division is affirmed with the modification that the declaratory aspect thereof shall not extend beyond liability for taxes for the remainder of the year of acquisition. No costs to any party in any court.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6

*For reversal*—None.