EVERS, J.T.C.
(temporarily assigned).
The thorny question raised in connection with the tax liability of riparian lands located in the Hackensack Meadowlands, with implications broader than its precise limitations, is presented in the following framework. At the request of the State of New Jersey (State) and Brancasons (taxpayer) the court has reconsidered its decision in Brancasons v. Carlstadt Boro., 6 N.J.Tax 1 (Tax Ct.1983). In that matter, as is pertinent to this reconsideration, the court determined that for the period from June 18, 1982, when a judgment was entered quieting title in the State for 9.044 acres of tidally-flowed virgin marshland, through December 31, 1982, taxpayer was entitled to reimbursement from the State for real property taxes paid on such land to the Borough of Carlstadt (borough). Following that decision taxpayer commenced an action in the Superior Court seeking reimbursement of not only the 1982 tax payments but of all payments made on the 9 + acres since it acquired title thereto in 1974. Claiming that, as a matter of law, it is exempt from the payment of real estate taxes, the State has moved for summary judgment. Taxpayer likewise seeks summary judgment. There are no issues of fact and the matter is ripe for disposition in a summary manner. Judson v. Peoples Bank and Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954). See also N.J.S.A. 54:4-3.3e which states:
In the event of any dispute between the owner and the State or State Agency, or such authority, as the case may be, in respect to the apportionment and payment of the said taxes or proportion thereof, the Superior Court shall have jurisdiction to determine the matter in a summary manner on the application of either the owner or of the State, State agency, or authority, as the case may be, and make any order as may be required and appropriate to carry out the court’s determination.
Borough, in opposition, relies on the court’s reasoning set forth in its original opinion and further claims that pursuant to R. 8:10, which provides that motions for a new trial or amend *416 ment of a judgment must be made within 20 days after the court’s conclusions are announced, the motions are untimely. Although more than 20 days elapsed between the court’s original decision and the filing of the motions, I find that borough’s defense is without merit.
I do not view these motions as being requests for a new trial. In fact the initial proceeding, to which the State was not a party, was initiated by taxpayer’s motion for partial summary judgment. Following that decision the State, within a reasonable time, moved to intervene, for reconsideration, and for summary judgment. Logically this motion falls within the scope of R. 4:50-1 which permits relief from a judgment or order for the specific reasons set forth therein and for “any other reason justifying relief from the operation of the judgment or order.” In view of the importance and novelty of the questions presented and particularly where the State had no opportunity to present its position in the original matter, I find that reconsideration is justified. See also R. 1:1-2 dealing with relaxation of rules.[1]
The subject 9 + acres is part of a 28 + acre parcel which was acquired by taxpayer in February 1974, all of which, as noted previously, is marshland located within the Hackensack Meadowlands. The Hackensack Meadowlands Development Commission has zoned the entire tract “marshland preservation” which limits the use of the property to certain scientific and aesthetic purposes in order to preserve the ecological values of the area. The entire parcel is known as Block 123, Lots 7, 8 and 9 and is *417 traversed by tidal tributaries and streams which infiltrate the tract from Berry’s Creek on the northwest side and from Peach Island Creek on the southwest. Other tributaries of the main stream infiltrate the property near the boundary between lots 7 and 8 and within lot 8.[2]
The State’s claims to such tidal-flowed lands and the litigation concerning such claims are both lengthy and complicated.[3] With respect to the subject lands, claiming that all or part of the premises are or were flowed by the mean high tide and are thus owned by the State pursuant to a grant of the Crown, the State in 1970 and thereafter filed certain maps pursuant to N.J.S.A. 13:1B-13.4 which delineated the lands subject to the claim. In 1970 taxpayer’s application to the State for a quitclaim conveyance was denied. In 1972 the State commenced an action seeking to enjoin taxpayer from introducing fill to the property. In June 1976 taxpayer filed a complaint to quiet title in the Superior Court, Law Division. N.J.S.A. 13:1B-13.5. The 1972 injunction action was consolidated with that matter. Six years later, on June 18,1982, judgment was entered in the quiet title action which, in pertinent part, stated:
ORDERED AND ADJUDGED that title to the riparian lands in question, 8.878 acres, is hereby vested in fee simple absolute in the defendant State of New Jersey, by the Tidelands Resource Council, in the Division of Coastal Resources, in the Department of Environmental Protection. The same is vested without any right, title or interest, legal or equitable whatsoever of any of the other named parties. Said parties, their heirs, representatives or assigns, are *418 hereby barred and foreclosed from ever asserting any claim, right, title or interest, legal or equitable whatsoever in said property.[4]
Additionally, commencing in 1979 and for each year thereafter, the taxpayer filed complaints with the Tax Court concerning the value of the property. In addition to claims of overvaluation and discrimination taxpayer claimed that the State owned a portion of the land and that taxpayer should be relieved of the tax burden thereon.[5] Following its motion for partial summary judgment concerning its claim of State ownership to a portion of the parcel the court entered the order which is the center of this controversy.[6]
Essentially the State’s argument consists of the following. (1) The quiet title judgment entered on June 18, 1982 did not constitute an acquisition within the meaning of N.J.S.A. 54:4-3.-3a et seq. but merely clarified what always was, i.e., State ownership of 9 + acres. (2) These tidelands are exempt from local property taxation under N.J.S.A. 54:4-3.3 merely by virtue of State ownership. (3) These tidelands are, in addition, used for a public purpose in the event such public use is a required criterion, in addition to ownership, in determining the exemption of tidelands under N.J.S.A. 54:4-3.3.[7] Notwithstanding the *419 specific issues presented by the parties it is clear that the overriding dispute involves a clash between the sovereign rights to such lands as may have been inherited by the State for the benefit of its citizens and the rights of those same citizens to a fair and stable system of taxation of real property. A discussion of both sides of that question is essential for an understanding of the court’s decision.
While a discussion of the historical background of State ownership of riparian lands is contained in the court’s original opinion, suffice it to say, as was said in Simpson v. Moorehead, 65 N.J.Eq. 623, 56 A. 887 (Ch. 1904) that:
... The State of New Jersey was, in its right as sovereign, the owner of all that belt of land lying at high water mark within the tidal waters of the State, and thence out into the sea or river, so far as there can be ownership of lands. That, in substance, is the holding in the leading cases of Arnold v. Mundy, 6 N.J.L. 1 (1821) and Martin v. Waddell, 18 N.J.L. 495 (1842) [at 628, 56 A. 887]
There can be no doubt that after the Revolution, the several states succeeded to all the rights and powers of the English Crown and Parliament in the soil under the tidewaters. Title and control of all lands below high water in tidal streams within New Jersey became vested in the State as sovereign. Schultz v. Wilson, 44 N.J.Super. 591, 131 A.2d 415 (App.Div.1957). Accordingly, both the State and taxpayer argue that a local taxing district is duty bound to recognize such State ownership and to carry the tidal-flowed lands on its tax exempt list. As an affirmative defense to taxpayer’s complaint the State claims;
A portion of the lands at issue herein is, and was at all times relevant to the within action, submerged tidal land clearly recognizable by the plaintiff and the Borough as owned by the State, absent the conveyance of its interest, and therefore not at any time taxable by the Borough. Said interior tidal stream lands are qualitatively and legally the same as the bed of Berry’s Creek, also a tidal stream, adjoining the lands in question, which is not taxed by the Borough.
Both the State and taxpayer argue that not only did the borough assessor have adequate notice of the State’s claim but that the assessor should have been able to determine the extent of State ownership. Taxpayer refers to the fact that the Office of Environmental Analysis, and its predecessors, were required to prepare maps and the Tidelands Resource Council, and its predecessors, were required by N.J.S.A. 13:1B-13.4 to publish *420 maps. The statute required the Tidelands Resource Council to do more than publish maps “designated by the Council as State owned lands.” The council was also required and did file maps with the clerk of each county, and “to the governing body of each municipality whose political boundaries include lands shown on the map.” These maps were filed in the early 1970s before the Braneasons tax appeals were filed. Thus, according to taxpayer, the assessor was on notice in the early 1970s that these maps designated State owned lands and should have taken them into consideration when assessing the subject premises. At the very least, argues taxpayer, the assessor should not have taxed Braneasons for the beds of the tide-flowed streams that traversed the premises.
In his certification the State’s expert witness, in an obvious attempt to demonstrate the ease with which, in the witness’ opinion, the assessor could identify the tidal-flowed property, stated:
... A substantial unnamed tidal water course extends to the center of the tract east to west from the confluence of Berry’s Creek and Peach Island Creek, both of which are significant tidal water courses. This unnamed tributary is large enough to form a boundary line between tax lots 7 and 8 on the north and lot 9 on the south____ The tax map also shows most of the other tidal tributaries on the property. Tidal streams infiltrate the property from the northwest and Berry’s Creek and from the southwest from Peach Island Creek and are shown on the tax map in a general fashion____ These tidal water courses are obvious meandering streams very similar, except in width and depth, to Berry’s Creek and Peach Island Creek from which they flow. All are free of vegetation above the mean high water level and all provide unrestricted tidal flow in and out of portions of the Braneasons property. Much of both the main stream and the tributary streams is submerged at mean low water as well---- An indication of the nature of these streams and their obvious character as tidal water courses is their appearance from the air____ Basically, the inland streams on the Braneasons property are essentially similar, when viewed from the air or on site, to Berry’s Creek or Peach Island Creek, their tidal sources.
Concerning these streams and the extent to which the surrounding lands are tidal-flowed taxpayer argued that if the assessor had made an onsite inspection of the property he would have had no trouble determining that the water courses *421 traversing the parcel were tide-flowed and that it was self-evident that the entire 28-acre parcel is not upland.[8]
In imposing the tax liability for the 9 + acre portion of the Brancason tract for six months and 12 days of 1982 on the State, the Tax Court held that the judgment entered in the quiet title action instituted by taxpayer against the State constituted an acquisition within the meaning of N.J.S.A. 54:4-3.3a. That statute states:
Real property acquired by the State or by a State agency, or by an authority created by the State, shall not be exempt from taxation during the period or periods following such acquisition, as prescribed in this act.
That act, which is part of article II of chapter 4 of Title 54 which deals exclusively with “persons and property exempt from taxation” must be read in conjunction with N.J.S.A. 54:4-3.3b and -3.3d. N.J.S.A. 54:4-3.3b, in pertinent part, states that where property is “acquired” by the State by purchase, condemnation, or otherwise such property shall become exempt as of January 1 of the following year subject to the notice conditions contained therein. N.J.S.A. 54:4-3.3d provides for reimbursement to the owner of taxes which it paid from the date of acquisition to the end of the year.
The State argues that N.J.S.A. 54:4-3.3a was enacted to codify the holding in East Orange v. Palmer, 47 N.J. 307, 220 A.2d 679 (1966), in which the Court considered the State’s liability for local property taxes on property acquired by condemnation or voluntary conveyance. In Palmer, the municipality maintained that property acquired by the State should remain subject to taxation from the date of acquisition to the end of the tax year. The Court was not concerned about the *422 exempt status of State property, but merely as to the mechanical means for implementing the exemption in the event the State’s acquisition occurred during the midstream of the tax year.
In holding that the exemption did not attach until the first day of the next year following acquisition, the Court, according to the State, was concerned with the financial problems that would confront municipalities in the event of establishing an exemption immediately after the midyear acquisition of property by a tax-exempt entity.
But more important, to relieve property which becomes exempt in mid-stream from the taxes for the balance of the year, at least where the acquisition is by an entity other than the municipality itself or a coterminous taxing district, would put the burden represented by those taxes solely on those who own property in the municipality rather than on all those in the larger area sharing in the public benefit — here highways open to the use of the people of the whole State — , as would be the case if the acquiring public entity were held responsible for the remaining taxes as part of the cost of acquisition. Conversely, even if the acquisition were by the municipality or a coterminous taxing district, cancellation of tax liability for the balance of the year can, to some extent at least, deprive other taxing entities, for which the municipality is the collector, of the timely availability of their shares of such taxes and thus impose the burden of a purely local acquisition upon the people of a larger, non-benefiting area.
On principle alone, therefore, we cannot attribute to the Legislature the intention to bring about such an inequitable result or impose such a burden on the taxpayers of the locality where the acquired property is situate,''absent specific enactment so requiring. [47 N.J. at 319, 320, 220 A.2d 679]
The Palmer Court’s holding is consistent with the apportionment statute, N.J.S.A. 54:4-56, which states:
Upon the sale and transfer for a valuable consideration or the acquisition through eminent domain or similar proceedings of any real estate in this state, unless otherwise provided in a written agreement between the seller and purchaser or the parties in said proceedings or unless otherwise expressly stipulated, the seller or owner of property to be acquired shall be liable for the payment of such proportion of the taxes for the current year upon the property to be conveyed or so acquired as the time between the previous January first and the date of the delivery of the deed by the seller to the purchaser or the date the condemning body acquired its title bears to a full calendar year.
Although recognizing that the apportionment statute did not specifically deal with the issue of when an exemption commences in the event a tax-exempt entity acquires property, the Court, nevertheless, noted that N.J.S.A. 54:4-56 manifested a *423 legislative intent that fairness warranted a proration of the taxes:
We can therefore only conclude that N.J.S.A. 54:4-56 is still confined to the matter of taxes prior to the date of conveyance or acquisition by condemnation. The section does not impose any personal liability on the former owner or condemnor vis-a-vis the municipality for such prorated taxes. All taxes are still borne by the land in the first instance. In the case of either sale or condemnation, the provision protects the grantee or condemnor vis-a-vis the seller or condemnee against responsibility for taxes covering that portion of the year prior to acquisition. In the case of condemnation, it also assures the municipality that such taxes will be satisfied out of the award____ Conversely, the section also inferentially gives recognition to the established principle of fairness that the prior owner of land “shall be called upon to contribute to the year’s revenues only a sum commensurate with the length of time the land has been held in that year ...” [47 N.J. at 323-324, 220 A.2d 679]
The Palmer decision thus established the important principle that an acquisition by the State required the State to be responsible for property taxes for the remainder of the year following such acquisition and provided for the commencement of the exemption as of January 1 of the year following acquisition. Palmer, however, according to the State, clearly confined its holding to “new ownership” by the State as manifested by an acquisition, i.e., condemnation or conveyance of title and was not directed to the tideland situation in the context of which the State has always had legal title to property and has always been entitled to tax exemption therefor. The State contends that the State’s ownership of tidelands is clearly not a circumstance either considered in Palmer or addressed in N.J.S.A. 54:4-3.3a et seq. The State’s ownership rights of tidelands is based on tidal flow and not on any acquisition within the meaning of the statute. Newark v. Natural Resources Coun. Dept. Env. Prot., 82 N.J. 530, 544, 414 A.2d 1304 (1980).
The State’s ownership of tidelands is defined by the high-water line or mark. In O’Neill v. State Highway Department, 50 N.J. 307, 235 A.2d 1 (1967) it was said:
The high-water line or mark is formed by the intersection of the tidal plane of mean high tide with the shore. The mean (sometimes called “ordinary”) high tide is defined as the medium between the spring and the neap tides. New Jersey Zinc & Iron Co. v. Morris Canal & Banking Co., 44 N.J.Eq. 398, 400-401 [15 A. 227] (Ch. 1888), affirmed o.b. 47 N.J.Eq. 598 [22 A. 1076] (E. & A. 1935). Mean high tide was stated in Borax Consolidated, Ltd. v. City of *424 Los Angeles, 296 U.S. 10, 26, 56 S.Ct. 23, 31, 80 L.Ed. 9, 20 (1935), to be “a mean of all the high tides” (our emphasis). That definition is deemed to be “more exact” in 1 Shalowitz, Shore and Sea Boundaries (1962), p. 96, and since the Coast and Geodetic Survey of the United States Department of Commerce, the acknowledged authority with respect to mean high tide readings, presumably utilizes all the high tides in preparing its data, we accept the definition it believes to be more precise. We subscribe also to the view of Borax that the average to be used should be, if possible, the average of all the high tides over a period of 18.6 years (296 U.S., at p. 26, 27, 56 S.Ct. at p. 31, 80 L.Ed., at p. 20) [50 N.J. at 323-324, 235 A.2d 1]
These principles have long been utilized to define the extent of the State’s ownership of tidelands. Therefore, the State’s ownership of such lands is continuing unless specifically conveyed and title to tidelands cannot be lost by adverse possession, prescription or estoppel. Id. 50 N.J. at 320, 321, 235 A.2d 1.
I agree, as contended by the State, that State ownership of tidelands was not a circumstance considered by the court in deciding Palmer or by the Legislature in enacting N.J.S.A. 54:4-3.3a. However I know of no authority, nor has any been cited to me, that would confine the application of a statute to the exact fact pattern that motivated the Legislature in enacting it in the first instance. Furthermore a close examination of the underlying reasoning in both Palmer and Brancasons v. Carlstadt, supra, clearly suggests a mutual concern for an equitable result. In Palmer, the Court said:
On principle alone, therefore, we cannot attribute to the Legislature the intention to bring about such an inequitable result or impose such a burden on the taxpayers of the locality where the acquired property is situate, absent specific enactment so requiring. [47 N.J. at 319, 320, 220 A.2d 679]
Additionally, as previously noted, the Palmer Court fashioned its remedy, at least in part, on the basis of N.J.S.A. 54:4-56 (the apportionment statute). In so doing, it commented:
____[T]he section (N.J.S.A. 54:4-56) also inferentially gives recognition to the established principle of fairness that the prior owner oí land “shall be called upon to contribute to the year’s revenues only a sum commensurate with the length of time the land has been held in that year____” [Id. at 323-324, 220 A.2d 679]
Like principles of fairness should apply here. However, the adoption of the position of the State and taxpayer that Palmer and thus N.J.S.A. 54:4-3.3a do not apply because the land in *425 question was always owned by the State, would do utter violence to the equities of the situation. It is inconceivable that the Legislature would provide for a fair solution to a Palmer problem, which pales in significance when compared to the magnitude of the overall problem presented here, and yet provide no relief to the hundreds of municipalities located in 17 of the 21 counties whose tax bases would be disastrously affected by a finding that the naturally flowed tidelands have always been tax exempt.
The State argues that the issue is not simply limited to the State’s liability to Brancasons for local property taxes paid on tidelands, but clearly relates to the general liability of the State to any party who may have mistakenly paid property taxes on tidelands. It points out that the State has not had sufficient time to even begin to estimate the potential fiscal ramifications of a finding that such liability exists. Clearly, it claims, the financial impact would be awesome. It urges consideration of the potential liability of the State to not only Brancasons but to all of the other owners of the property prior to 1974. If Brancasons is entitled to reimbursement from the State for taxes paid for the period extending to 1974, then, according to the State, the predecessor owners of such property may also lay claim to similar relief. That scenario is subject to repetition with regard to all other tideland properties, according to its argument.
That argument seemingly recognizes that if the local taxing district officials knew, or should have known, the extent of State owned riparian lands then it was error for the taxing district to assess and accept tax payments from one not the owner. A taxpayer seeking a refund under the circumstances is seemingly not barred by any time limitation. See Farmingdale Realty Co. v. Bor. of Farmingdale, supra, and McShain v. Evesham Tp., 163 N.J.Super. 522, 395 A.2d 251 (Law Div. 1978).
The magnitude of the problem was, and is, recognized by this court. However the extent of the responsibility of the State is *426 vastly diluted in noting that the court’s original decision burdens the State with tax payments for a period not to exceed one year and perhaps far less, depending on the time of acquisition or, as in this case, the date on which the State’s ownership and the extent of that ownership is determined and defined. By holding that it is the date of entry of the quiet title judgment that triggers the mechanism provided for in N.J.S.A. 54:4-3.3a, a mechanism which effectively prohibits the taxpayer from claiming reimbursement for past tax payments and obligates the State to pay (or reimburse) the taxes from that date only to the end of the calendar year, the taxpayer cannot be heard to complain. Here, notwithstanding the claims of the State which have been in existence for over 200 years, taxpayer has had the use of such lands. The value of such use was recognized in Town of Secaucus v. Damsil, 120 N.J.Super. 470, 295 A.2d 8 (App.Div.1972) where, in the context of a tax appeal, the court refused to consider the effect (on value) of the State’s riparian claims. The court held that it is the value of the land, including all interests therein, and not the value of the owner’s title, that is to be determined. Under the circumstances it cannot be said that a denial of taxpayer’s claim to reimbursement of all taxes paid on such affected lands would do violence to the equities of the situation.
But neither can the State have it both ways. After a prolonged vacation of approximately 200 years, simply because the State is now actively pursuing enforcement of its sovereign interests and thus bringing to a climax direct confrontation with record title owners who were previously unaware of their potential partners or landlords, does not give the State license to do to its citizens what its citizens cannot do to it. Indeed general equity, fundamental fairness, and the constitutional guarantee that each citizen will bear no more than his fair share of the tax burden would all be violated because the State has chosen this moment in time to enforce an archaic doctrine born during the reign of Charles II. The economic necessity of stability of taxation is not to be cast aside because of the newly *427 discovered economic and environmental value of the marshlands.
The tight relationship between the raising of necessary governmental revenues and the taxable properties on the rolls should be obvious from the dissertation presented on the subject in the court’s original opinion. 6 N.J.Tax at 8, 9. Considerable time and effort are devoted to the compilation of budgets, assessments and tax rates by each of the 567 taxing districts and the 21 counties. The integrity of those efforts, the past expenditures and the future commitments envisioned by local government leaders are all preserved by the court’s original decision. Conversely, the obverse is to destroy stability; to impose nightmarish duties on local officials; to foist on assessors impossible burdens and perhaps, to render taxing districts insolvent.
The simplistic approach advanced by the State and taxpayer which places the entire burden on the taxing district to do what the State has not done in 200 years would, in this court’s judgment, result in a very tidy mess. It cannot be denied that the sovereign has an interest in all tidelands but the simplicity of that statement is destroyed in attempting to locate the boundary that separates the sovereign and private interests. Those boundaries are snuggled comfortably and dormantly in most coastal and estuarine areas. The detection or elimination of this interest in some instances is mechanical and obvious. However, in many cases, it is hazy and problematical. Customarily the plotting of such boundary lines is on a flat, tangible, visible surface. However in the marsh, the problem reaches a new magnitude and the boundary is to be determined by the phenomenon of the tides. Here, where land and sea meet and where water inundates the shores of a tributary, the result is ambiguous and changing. An invisible boundary disappears and then reappears. (Even a brief reference to appendix A illustrates the problem). This court, consistent with Palmer, cannot adopt the arguments presented by the State and the taxpayer. I cannot attribute to the Legislature the intention, *428 as urged by those parties, to bring about such an inequitable result or impose such a burden on the assessor and the taxpayers of the locality where the acquired property is situated, absent specific enactments so requiring.
If, as contended by the State, N.J.S.A. 54:4-3.3a does not apply, there exists no enactment which precisely settles the matter. The legislative intent must therefore be determined inferentially. Under the circumstances an equitable remedy must be fashioned. In Salorio v. Glaser, 93 N.J. 447, 461 A.2d 1100 (1983), the court quoted the language of Chief Justice Burger, (Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973)) wherein he stated, “Equitable remedies are a special blend of what is necessary, what is fair, and what is workable.” 93 N.J. at 463, 461 A.2d 1100. By viewing the interest of the State as a claim, no more and no less, until it is perfected and the ownership and extent thereof is clarified, is in the words of Chief Justice Burger, necessary, fair and workable.
I find no reason to disturb the provisions of the order as originally entered. In addition to the provisions contained therein the State is further directed to reimburse taxpayer for the tax payments made on the 9.044 acres from June 18,1982 to December 31, 1982. Taxpayer’s claim for reimbursement for tax payments during the period from February 1974 to June 18, 1982 is denied.

*429

 Notwithstanding his argument concerning timeliness, at oral argument borough’s counsel, in deference to the importance of the matter did not press the issue against the State. With respect to the taxpayer, borough’s argument based on R. 4:49 is also misplaced. Taxpayer, in count 1 of its Superior Court suit, simply seeks to enforce the order of the Tax Court. In count 2 taxpayer adopts the State's argument that it (the State) always owned the 9+ acres; such being the case it seeks reimbursement of all taxes paid by it on that portion of the tract pursuant to N.J.S.A. 54:4-54. See Farmingdale Realty Co. v. Borough of Farmingdale, 55 N.J. 103, 259 A.2d 708 (1969). Taxpayer's summary judgment motion based on its Superior Court complaint was simply consolidated with the State’s motion for reconsideration and summary judgment.

 A sketch of the property, appendix A, which shows the boundary lines of the three lots, the main streams and tributaries, the "mean high waterline”, and the approximate 9+ acres owned by the State is attached hereto and made part of this opinion.

 As noted in the original opinion, while estimates vary, there is no question that the amount of land potentially subject to such claims is vast. The Assistant Commissioner for Natural Resources of the Department of Environmental Protection has estimated that 235,000 acres might be involved. Of the 21 counties in New Jersey, all except Warren, Sussex, Hunterdon and Morris are subject to investigation for potential claims to lands now or formerly flowed by the tides. The areas subject to investigation are depicted on 1,632 base photomaps covering 2,452 square miles or almost 30% of the total land and water area of the State. 6 N.J.Tax at 9.

 Subsequent to the original Tax Court decision the quiet title judgment was amended to provide that the State owned 9.044 acres and not 8.878 acres as originally determined by that judgment.

 The lands claimed to be owned by the State varied from year to year. In 1979 and 1980 taxpayer claimed all but .8 acres was owned by the State; in 1981 taxpayer claimed that it owned only 1.29 acres and in 1982 it claimed title to approximately 19 acres.

 Based on taxpayer’s calculations the reimbursement due from the State from June 18, 1982 to December 31, 1982 is $1,734.22. From the date of acquisition by taxpayer to June 18, 1982 the tax payments amounted to $13,773.92. The total reimbursement sought by taxpayer in count 2 of its Superior Court complaint is $15,508.04.

 The question of whether mere ownership alone entitles the State to exemption pursuant to N.J.S.A. 54:4-3.3 or whether ownership plus use is required need not be addressed. If "use" is, in fact, required, such requirement is satisfied here.

 The State’s expert suggested that if borough officials “had gone out and merely excluded the parts of the property it could have gotten to by rowboat or canoe they would have come very close [to a determination that 9 + acres were owned by the State].’’ Taxpayer’s counsel claimed that the assessor would have come to the same conclusion if "he had just walked out on the property at high tide.”
A full discussion of the practical difficulties confronting an assessor in such situations is found in the original opinion. 6 N.J.Tax at 9.