### HAYS v REGENTS OF THE UNIVERSITY OF MICHIGAN

1. COLLEGES AND UNIVERSITIES—TUITION—RESIDENCY REGULATIONS—
   CONSTITUTIONAL LAW—GOOD FAITH—REFUNDS—EQUITY.

   The constitutional validity of a university's residency regulation which created an irrebuttable presumption of nonresidency for certain students for tuition purposes was questionable at best where various state and Federal decisions had foreshadowed a United States Supreme Court decision holding such a regulation unconstitutional, and where the Attorney General had warned the university that an irrebuttable presumption of nonresidency would be almost impossible to defend; therefore, the university's argument that it promulgated its now-unconstitutional regulation in good faith and should not be required to refund overpayments to students wrongfully classified in good faith as nonresidents does not interpose an automatic bar to a trial court's order requiring repayment, and the Court of Appeals must balance the equities to determine whether fairness militates against requiring the university to make tuition refunds.

2. COLLEGES AND UNIVERSITIES—TUITION—RESIDENCY REGULATIONS—
   CONSTITUTIONAL LAW—REFUNDS—SUBSTANTIAL BURDEN.

   A university should not be required to refund the excess tuition collected from students classified as nonresidents by an unconstitutional residency regulation where the funds collected have already been budgeted and disbursed, the individual contribution by each plaintiff student is *de minimis* when considered as a percentage of the total tuition collected in the academic year, the university collected the tuition from the plaintiff students at nonresident rates under regulations promulgated in a prima facie correct manner, and where to require the refund of overcharges would impose a substantial burden on the university that it would find difficulty in meeting.

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 15 Am Jur 2d, Colleges and Universities §§ 18, 20.
Determination of residence or nonresidence for purpose of fixing tuition fees or the like in public school or college, 83 ALR2d 497.

3. COLLEGES AND UNIVERSITIES—TUITION—RESIDENCY REGULATIONS—
EXHAUSTION OF ADMINISTRATIVE REMEDIES—EXCUSE—CLASS AC-
TION.

The failure of plaintiff students who were classified as nonresi-
dents for tuition purposes by an unconstitutional university
residency regulation to petition the university for reclassifica-
tion and thereby exhaust their administrative remedies is
excused where the facts disclose an attitude on the part of the
university to continue to deny petitions for reclassification
because it would have been a vain and useless act for these
plaintiffs to have sought further administrative relief; such
students were eligible members in a class action against the
university.

Appeal from Washtenaw, William F. Ager, Jr.,
J. Submitted Division 2 February 13, 1974, at
Detroit. (Docket No. 17702.) Decided May 31, 1974.
Leave to appeal applied for.

Complaint by Brian J. Hays and others for
themselves and on behalf of all other members of
their class against the Regents of the University of
Michigan challenging the constitutionality of de-
fendants' residency regulations for tuition pur-
poses. Judgment for plaintiffs. Defendants appeal
by leave granted. Plaintiffs cross appeal. Affirmed
as modified and remanded for further proceedings.

*Virtue & Carpenter, P. A.,* for plaintiffs.

*Roderick K. Daane,* for defendant.

Before: V. J. BRENNAN, P. J., and McGREGOR and
T. M. BURNS, JJ.

T. M. BURNS, J. This case involves the validity of
defendant's regulations classifying students as resi-
dents or nonresidents for differential tuition pur-
poses. Plaintiffs initiated this class action suit
challenging the constitutional basis of said regula-
tions. On December 1, 1972, the Washtenaw Cir-

cuit Court entered an order recognizing this case as a proper class action under GCR 1963, 208.1. On May 9, 1973, the court issued its opinion stating that the defendant has a right to require persons to have a six-month continuous residency prior to enrolling as a resident, but holding that the specific regulation providing that "no person is deemed to have gained or lost residence while a student at any institution of learning * * * except that enrollment in a Michigan institution for three semester hours or less during the required six months' period shall not preclude the establishment of resident status" had, based on the evidence, been interpreted as an irrebuttable presumption that anyone attending the University of Michigan and taking over three hours of credit work could never obtain residency for tuition purposes. The court found this interpretation to be without rational basis and a denial of the constitutional right of equal protection.

On June 7, 1973, the court entered a judgment enjoining defendant from enforcing § 2 of its residency regulations in determining the tuitional residency of any student; severing § 2 from the remaining residency regulations; granting any members of plaintiff class who paid nonresident tuition since May, 1972, three months to apply to defendant for a hearing concerning his or her eligibility for resident tuition for any semester in which nonresident tuition was paid; requiring plaintiffs to publish notice of the judgment; providing as standards for the hearing the guidelines set forth in the court's opinion; establishing a segregated refund account; and granting a stay pending timely appeal.

This Court granted leave to appeal on August 16, 1973, and stayed further proceedings below pending disposition of this appeal.

Defendant concedes that the substantive issues concerning the constitutional validity of its rule no longer merit consideration on appeal, due to subsequent action by the United States Supreme Court in *Vlandis v Kline,* 412 US 441; 93 S Ct 2230; 37 L Ed 2d 63 (1973). *Vlandis* conclusively settled the merits in favor of the plaintiffs. The tuition-residency rule in effect at the time this suit was tried is unconstitutional. The remaining issues posed by defendant will be discussed and decided in the manner presented below.

1. *Did the trial court err in requiring defendant university to make tuition refunds to certain members of the plaintiff class?*

Defendant maintains that since the university promulgated its now-unconstitutional regulation in good faith, the university should not be required to refund overpayments to students wrongfully classified in good faith as nonresidents.

Plaintiffs counter with their argument that since the constitutional validity of the challenged regulation was doubtful before the United States Supreme Court decided *Vlandis v Kline, supra,* the university cannot now make a colorable good faith reliance claim.

The *Vlandis* decision was rendered on June 18, 1973. However, various state[1] and Federal[2] decisions had foreshadowed its result. Although there were a few decisions which favored the university's position,[3] the university knew or should have known that in May of 1972, the constitutional

---

[1] *See, e.g., Covell v Douglas,* — Colo —; 501 P2d 1047 (1972); *Newman v Graham,* 82 Idaho 90; 349 P2d 716 (1960).

[2] *Vlandis v Kline,* 346 F Supp 526 (D Conn, 1972) (three-judge court); *Robertson v Regents of the University of New Mexico,* 350 F Supp 100 (D NM, 1972) (three-judge court).

[3] *See Thompson v Board of Regents of the University of Nebraska,* 187 Neb 252; 188 NW2d 840 (1971); *Glusman v Trustees of the University of North Carolina,* 281 NC 629; 190 SE 2d 213 (1972).

validity of its regulation was questionable, at best. That conclusion finds support in the fact that on July 20, 1970, the Attorney General[4] warned the university that an irrebuttable presumption of nonresidency would be almost impossible to defend.

The facts thus fully justify the plaintiffs in claiming that the university's position "was not naive, rosy cheeked, good faith reliance but a deliberate gamble on a possible but not probable reversal of *Kline v Vlandis* in the Supreme Court". This "reliance" cannot be said to have been induced by an unbroken chain of precedents stringing back over the years. In view of this, the university's "reliance" on precedent does not interpose an automatic bar to the relief granted by the lower court. This Court must, therefore, balance the equities to determine whether, despite the university's reliance on questionable precedents in enforcing the regulation at bar during the trial of this cause, fairness militates against requiring it to make tuition refunds.

The United States Supreme Court enunciated the applicable standards of review in *Lemon v Kurtzman,* 411 US 192; 93 S Ct 1463; 36 L Ed 2d 151 (1973) *(Lemon II).* Speaking for the majority, Chief Justice Burger stated:

"Claims that a particular holding of the court should be applied retroactively have been pressed on us frequently in recent years * * * . In each of these cases, the common request is that we reach back to disturb or to attach legal consequence to patterns of conduct premised either on unlawful statutes or on a different understanding of the controlling judge-made law from the rule that ultimately prevails.

* * *

---

[4] Michigan Attorney General's letter opinion, July 20, 1970.

"In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow * * * . Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable.

* * *

"In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding those interests have constitutional roots."

The Court then went on to affirm the judgment of the lower court[5] and refused to retroactively apply *Lemon v Kurtzman,* 403 US 602; 91 S Ct 2105; 29 L Ed 2d 745 (1971) *(Lemon I).*

In *Lemon I,* the Court, in an opinion handed down on June 28, 1971, held that the Pennsylvania statutory program to reimburse nonpublic sectarian schools for certain secular educational services violated the Establishment Clause of the First Amendment. The case was remanded to the three-judge district court, where the issue to be resolved was whether payments made during, or contracted to be made for, the 1970–1971 academic year, which had terminated prior to June 28, 1971, had to be returned.

The three-judge district court held no. First, the court said it saw no hardship flowing to any of the plaintiffs if restitution was not required because "[t]he state has already collected the funds to be allocated to the nonpublic schools and plaintiffs' contribution to this fund has been *de minimis".*[6] Second, the court recognized that the parochial schools affected has "adjusted their budgets [in

---

[5] 348 F Supp 300 (ED Pa, 1972) (three-judge court).

[6] 348 F Supp at 304.

reliance on the promised funds] and performed the services required by them". To later deny them the promised reimbursement and instead require repayment "would impose upon them a substantial burden which would be difficult for them to meet". 348 F Supp at 304–305. The detrimental reliance involved was bona fide.[7] Thus, in order to avoid the hardships that rejecting that reliance would entail, restitution was not ordered. The Supreme Court agreed with that analysis and affirmed in *Lemon II, supra.*

The principles enunciated in *Lemon II* are directly applicable to the present case before us. The legislation challenged in *Lemon I,* enacted as a subterfuge to channel state funds to parochial schools without offending the First Amendment's Establishment Clause, was of questionable constitutionality from the time of its conception. The tuition-residency regulations challenged here were also of questionable constitutionality when the plaintiffs instituted suit on February 29, 1972. In *Lemon I* and *II,* Pennsylvania disbursed funds to parochial schools pursuant to a statute subsequently declared unconstitutional. Here also the University collected tuition from the plaintiffs at nonresident rates under a regulation later declared unconstitutional. Thus, in each instance, the facts are nearly identical.

The analysis in *Lemon II* of the equities involved also applies to the present case. As far as these plaintiffs are concerned, the university has already collected the tuition for the 1972–1973 academic year from all students enrolled during that period. Presumably, these funds have already

---

[7] As to each school, as the Supreme Court recognized, a determination of actual reliance would be subtle because turning essentially on credibility rather than facts of record. 411 US at 205; 93 S Ct at 1472; 36 L Ed 2d at 164, fn 6.

been budgeted and disbursed. The individual contribution by each student is *"de minimis"* when considered as a percentage of the total tuition collected in the 1972–1973 academic year. Therefore, the economic interest these plaintiffs seek to vindicate is indistinguishable from the economic interest the *Lemon* plaintiffs sought to vindicate in *Lemon II.*

Concerning the question of reliance, as far as the university is concerned, it collected tuition from the plaintiffs at nonresident rates under regulations promulgated in a prima facie correct manner. To say, as the plaintiffs do, that the university's reliance on the constitutional validity of those regulations was not "naive [and] rosy cheeked" but rather "a deliberate gamble" is not to say that such reliance was in bad faith. As pointed out earlier, the monies collected have presumably been budgeted and spent by the university. To now require their refund would impose a substantial burden on the university that it would find difficulty in meeting. To meet this burden, the university would either have to divert money from current operating funds, with a corresponding diminution in quality of other existing university programs, or else the deficit would have to be covered by the next legislative appropriation. In either event, the funds available to support the current levels of educational services would at some time be significantly reduced.

In light of the foregoing identification and balancing of the competing equities in the instant case, *Lemon II* compels this Court to conclude that the university should not be required to refund the excess tuition collected from the plaintiff class in the 1972–1973 school year. The lower court disagreed and expressly made its decision retroactive

to May 22, 1972, the date this suit was filed. The question we must now consider is whether this Court can modify that decree on appeal.

In reviewing decisions in chancery, Michigan appellate courts consider cases *de novo* on the record. An appellate court does not ordinarily disturb the findings of a trial court in an equity case unless, after an examination of the entire record, the reviewing court concludes that it would have arrived at a different result, had it been in the position of the trial court, who is in a better position to test the credibility of the witnesses by observing and hearing them in court. *Christine Building Co v City of Troy,* 367 Mich 508; 116 NW2d 816 (1962); *Rose v Fuller,* 21 Mich App 172; 175 NW2d 344 (1970); *Gamble v Hannigan,* 38 Mich App 500; 196 NW2d 807 (1972).

In the case of equitable decrees, the scope of review is necessarily narrow in light of the broad scope[8] of the chancellor's discretion. *Lemon II, supra,* 411 US at 200; 93 S Ct at 1469; 36 L Ed 2d at 161. However, it is also focused tightly when constitutional rights are involved:

> "The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." *Swann v Charlotte-Mecklenburg Board of Education,* 402 US 1, 16; 91 S Ct 1267, 1276; 28 L Ed 2d 554, 566 (1971).

For our purposes, the scope of review is reposed in GCR 1963, 820.1(1) and 820.1(7).

As mentioned earlier, the parties concede that *Vlandis v Kline, supra,* authoritatively resolved the merits in favor of the plaintiffs. Neither does

---

[8] "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown v Board of Education of Topeka,* 349 US 294, 300; 75 S Ct 753, 756; 99 L Ed 1083, 1106 (1955).

either party now challenge the findings of fact of the trial court. For this reason, the standard of review enunciated in the *Christine* line of cases is inapposite. The controversy is over the relief decreed by the lower court. In light of the competing equities as identified and balanced in this opinion, we feel that the facts of this case do not compel the result reached below. Accordingly, since we would have arrived at a different result had we been in the position of the trial court, we must modify the lower court's decree by striking that portion that requires the university to make tuition refunds to the plaintiffs for the 1972–1973 school year.

2. *Did the trial court err in finding this cause to be a proper class action where the individual plaintiffs failed to exhaust their administrative remedies before instituting suit?*

Defendant contends that since these individual plaintiffs did not exhaust their administrative remedies, they lack standing to sue and thus cannot adequately represent all members of the purported class. Plaintiffs counter by arguing that there is no need to exhaust administrative remedies when such action would be futile.

In *Trojan v Taylor Twp,* 352 Mich 636, 638–639; 91 NW2d 9 (1958), the Court stated:

"There is a general rule that persons seeking authority from a governmental unit must exhaust their remedies within such governmental unit before seeking relief in court. To this rule requiring the plaintiff to exhaust his administrative remedies, there are a number of exceptions, one clear exception is that the law will not require a citizen to undertake a vain and useless act. The law does not require useless expenditures of effort. Where it is clear that resort to the administrative body is but a formal step on the way to

the courthouse, the law will not require such a step to be taken."

In this case the facts clearly disclose an attitude on the part of the university to continue to deny petitions for reclassification to students who had not been within Michigan for six months without enrolling in the university for less than four credits. The university has applied its residency rules inflexibly as far as the plaintiff class was and is concerned.[9] With this attitude on the part of the university being so clearly manifest, it would have been a "vain and useless act" for these plaintiffs to have sought further administrative relief. This being the case, the plaintiffs' failure to seek such relief is excused. It follows that these plaintiffs are proper representatives of their class.

We have carefully considered the remaining allegations of error raised by defendant and by the plaintiffs in their cross appeal and based upon our review of the record and briefs find no reversible error.

Affirmed as modified, and remanded for further proceedings not inconsistent with this opinion.

All concurred.

---

[9] *See* the letter of the Registrar to Robert W. Jaspen, dated August 6, 1971.