JOHN SALORIO, ROBERT COE AND JOHN D. MCGARR, JR., PLAINTIFFS-APPELLANTS, v. SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued December 6, 1982—Decided June 8, 1983.

448

*Max Gitter,* a member of the New York bar, argued the cause for appellants (*Connell, Foley & Geiser,* attorneys; *Max Gitter, Suzanne Last Stone,* a member of the New York bar, *Adrian M. Foley, Jr.,* and *Kevin J. Coakley,* of counsel).

*Michael R. Cole,* Assistant Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Michael R. Cole, Mary R. Hamill* and *Andrea M. Silkowitz,* Deputy Attorneys General, on the briefs).

The opinion of the Court was delivered by

SCHREIBER, J.

This case concerns the constitutionality of the Emergency Transportation Tax Act (ETT), *N.J.S.A.* 54:8A–1 to –57. Plaintiffs are three New York residents who commute or have commuted from their homes in New York to work in New Jersey. Claiming that the ETT, an obligation levied on the New Jersey-derived income of only New York residents, discriminates unconstitutionally against them, plaintiffs seek declaratory and injunctive relief in addition to damages. This cause was initially decided by the trial court after a summary proceeding without testimony pursuant to *R.* 4:67 and was certified for direct appeal to this Court. 81 *N.J.* 269 (1979). In *Salorio v. Glaser (Salorio I),* 82 *N.J.* 482, *cert.* denied, 449 *U.S.* 874, 101 *S.Ct.* 215, 66 *L.Ed.*2d 94 (1980), we held that the ETT does not violate the Equal Protection Clause of the fourteenth amendment, *U.S. Const.,* amend. XIV, § 1. We remanded for plenary hearing to

make a complete record so as to enable the trial court to determine whether the ETT contravenes the Privileges and Immunities Clause of the federal constitution, *U.S. Const.,* art. IV, § 2, cl. 1. Today we review the proceedings that followed our remand.

## I

The facts were fully described by Justice Pashman in *Salorio I.* 82 *N.J.* at 488–90. A summary is sufficient for an understanding of this opinion. New Jersey has developed, constructed and maintained commuter transportation facilities so that residents of New Jersey and New York residing in one state and working in the other can move more readily between these states. State expenditures for this purpose have been and are financed in part by general revenue taxes and in part by taxes collected specifically to defray the cost of transportation programs. One revenue source earmarked for these state expenditures is the Emergency Transportation Tax (ETT), first enacted in 1961. *L.*1961, *c.* 32.[1]

Under the existing scheme New York residents who commute to work in New Jersey must pay the higher of the New Jersey Gross Income Tax, *N.J.S.A.* 54A:1–1 to :10–12, or the ETT, each of which is imposed only on income earned in New Jersey. If the ETT obligation is the greater of the two and is therefore imposed, that part of the ETT revenues equivalent to the New Jersey Gross Income Tax is paid into the Property Tax Relief Fund. *N.J.S.A.* 54:8A–121; *N.J.S.A.* 54A:9–25.[2] The balance of

---

[1]When *Salorio I* was decided, the ETT act was to expire on December 31, 1980. *See L.*1969, *c.* 36; 82 *N.J.* at 500. The Legislature has since extended its life through December 31, 1990. *See L.*1980, *c.* 89, § 1; *N.J.S.A.* 54:8A–57.

[2]Prior to the 1976 Gross Income Tax Act, the entire ETT liability was paid into the Transportation Fund.

the ETT revenues is deposited in a special "Transportation Fund," *N.J.S.A.* 54:8A–120, identified for projects and programs to meet transportation problems.[3] *N.J.S.A.* 54:8A–20(a).

In *Salorio I,* we noted that under the Privileges and Immunities Clause [4] residents and nonresidents are to be treated with "substantial equality," 82 *N.J.* at 501, and that the ETT tax, which falls only on New York residents, involves a constitutionally-protected right to pursue an occupation outside their home state. *Id.* We stated that a statute that causes disparate treatment of nonresidents is invalid under the Privileges and Immunities Clause, unless (1) the State can prove that nonresidents are a "peculiar source" of the evil at which the statute is aimed and (2) the singular treatment of nonresidents bears a "substantial relationship" to the particular evil that nonresidents are said to present. *Id.* at 503–04. We agreed with the State that costs and expenses related to mass transportation due to the almost daily movement of large numbers of people from New York to New Jersey served as a valid independent justification for a commuter tax on nonresidents. *Id.* at 504–05. On the record before us in *Salorio I,* however, we could not identify the extent of the "peculiar source" of the transportation problem attributable to the New York commuter or the "substantial relationship" that the tax levied on the New York commuter bore to costs expended in attempting to solve that problem.

With regard to "peculiar source," we explained:

While commuters living in New York need not be the sole cause of New Jersey's transportation crisis to justify discriminatory treatment, more than merely their identification is required. The State's burden of showing that non-residents constitute a "peculiar source" of an evil would be stripped of meaning if that

---

3If monies in the Transportation Fund are misapplied, a refund or credit must be given to the taxpayer. *N.J.S.A.* 54:8A–22.

4The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States. [*U.S. Const.,* art. IV, § 2]

obligation could be discharged simply by referring to a problem to which non-residents make but a small contribution. [*Id.* at 505 (footnote omitted)]

The "substantial relationship" test also required particular proof:

Imposition of the ETT cannot be justified if it appears that the tax burden on New York residents is substantially disproportionate to their burden upon New Jersey's transportation facilities.

This is not to say that non-resident commuters cannot be charged for any benefits resulting from New Jersey's subsidization of commuter transportation facilities and expenditures for highway construction and maintenance in northern New Jersey. The Constitution does not entitle nonresident commuters to a "free ride." The State may exact from them a fair share of the cost of adequate transportation facilities without violating the Privileges and Immunities Clause.

The record discloses that expenditures for highway construction and maintenance in northern New Jersey amounted to $910 million during the years 1970 through 1977. Since none of these funds came from emergency transportation taxes, non-residents apparently did not contribute to the cost of providing these vital transportation facilities. The expenditure figures introduced also indicate, however, that ETT funds have supplied a very substantial portion of state expenditures for bus and rail facilities. While non-resident use of such facilities constitutes a very small percentage of total patronage, we recognize that a strict percentage analysis is not required for each separate type of commuter transportation facility. [*Id.* at 505–06 (footnotes omitted)]

The State was thus required to produce evidence to determine whether the tax imposed on New York commuters is commensurate with the share of the expenditures related to the transportation problem they cause. *See id.* at 517.

After a five-day hearing pursuant to our remand in *Salorio I,* the trial court found the burden of the ETT on New York commuters to be "substantially commensurate with the benefit they derive from the use of New Jersey's transportation facilities." Accordingly, the trial court held that the ETT does not violate the Privileges and Immunities Clause. We certified the case for direct review on our own motion. 91 *N.J.* 182 (1982).

II

The Supreme Court has frequently observed that the principal purpose of the Privileges and Immunities Clause of article IV, section 2, of the Constitution is "to help fuse into one Nation a

collection of independent, sovereign States. It was designed to ensure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy."[5] *Toomer v. Witsell,* 334 *U.S.* 385, 395, 68 *S.Ct.* 1156, 1162, 92 *L.Ed.* 1460, 1471 (1948). The Clause's predecessor, which had the same intent, is found in the Articles of Confederation, art. IV, par. 1. Thus, protection is afforded the nonresident who lacked the right to vote and who was vulnerable to local bias or insensitivity. J. Ely, *Democracy and Distrust* 83 (1980); Simson, "Discrimination Against Nonresidents and the Privileges and Immunities Clause of Article IV," 128 *U.Pa.L.Rev.* 379, 384–86 (1979). At the heart of the Clause "is the right of a citizen of one state to pass into any other state of the Union for the purpose of engaging in lawful commerce, trade or business, without molestation . . . ." *Ward v. Maryland,* 79 *U.S.* (12 Wall.) 418, 430, 20 *L.Ed.* 449, 452 (1871). It forbids one state from unduly discriminating against citizens of another state in favor of its own. Excepted from this principle is the situation in which the discrimination against the nonresident relates to conduct or activities that are not "basic to the maintenance or well-being of the Union." *Baldwin v. Fish & Game Comm'n,* 436 *U.S.* 371, 388, 98 *S.Ct.* 1852, 1863, 56 *L.Ed.*2d 354, 368 (1978). The theory behind this exception is that state discrimination concerning nonfundamental activities does not "frustrate the purposes of the formation of the Union." *Id.* at 387, 98 *S.Ct.* at 1862, 56 *L.Ed.*2d at 368. For a criticism of this view, see Varat, "State 'Citizenship' and Interstate Equality," 48 *U.Chi.L.Rev.* 487, 511 (1981), contending that the purpose of the Clause was to promote political and social cohesion as well as economic interrelationship.

---

[5]"Citizens" has been interpreted to be equivalent to residents, *Austin v. New Hampshire,* 420 *U.S.* 656, 662 n. 8, 95 *S.Ct.* 1191, 1195 n. 8, 43 *L.Ed.*2d 530, 536 n. 8 (1975), but not to include corporations, *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 *U.S.* 648, 656, 101 *S.Ct.* 2070, 2076, 68 *L.Ed.*2d 514, 522–23 (1981); *Paul v. Virginia,* 75 *U.S.* (8 Wall.) 168, 19 *L.Ed.* 357 (1869).

In analyzing a statute challenged under the Privileges and Immunities Clause, it is necessary to determine if the statute discriminates against nonresidents, to identify the nature and extent of that discrimination, and to decide whether the discrimination is reasonably related to legitimate purposes that are the bases for the discrimination. If there is no substantial reason for the discrimination, the clause is violated and the inquiry is at an end. *Austin v. New Hampshire,* 420 *U.S.* 656, 95 *S.Ct.* 1191, 43 *L.Ed.2d* 530 (1975). If there are one or more substantial reasons for the discrimination, then the discrimination must bear a close relationship to them. Put another way, the nonresident must "constitute a peculiar source of the evil at which the statute is aimed," *Hicklin v. Orbeck,* 437 *U.S.* 518, 525–26, 98 *S.Ct.* 2482, 2488, 57 *L.Ed.2d* 397, 404 (1978) (quoting *Toomer v. Witsell,* 334 *U.S.* at 398, 68 *S.Ct.* at 1163, 92 *L.Ed.* at 1472), and there must be a "substantial relationship" between the evil and the discrimination practiced upon them, *id.* at 527, 98 *S.Ct.* at 2488, 57 *L.Ed.2d* at 405; *see also Mullaney v. Anderson,* 342 *U.S.* 415, 418, 72 *S.Ct.* 428, 430, 96 *L.Ed.* 458, 462 (1952).

When a state is exercising its taxing power, there should be substantial equality of treatment, unless a justification is advanced supportive of the discrimination. Such justifications must be linked to some evil or problem caused by the nonresident, and, if linked, the revenue derived from the tax should bear a substantial relationship to the cost of amelioration of the evil or the solution of the problem. The correlation need not be perfect and a state has "considerable leeway in analyzing local evils and in prescribing appropriate cures." *Toomer v. Witsell,* 334 *U.S.* at 396, 68 *S.Ct.* at 1162, 92 *L.Ed.* at 1471; *see, e.g., Shaffer v. Carter,* 252 *U.S.* 37, 56–57, 40 *S.Ct.* 221, 227, 64 *L.Ed.* 445, 458–59 (1920) (noting that a statutory provision limiting loss deductions for nonresidents to losses incurred within the taxing state, whereas residents could deduct all losses, was justified

because, unlike the income of nonresidents, residents' income wherever derived was subject to the state income tax); *Travelers' Ins. Co. v. Connecticut,* 185 *U.S.* 364, 22 *S.Ct.* 673, 46 *L.Ed.* 949 (1901) (upholding stockholder tax credit available only to residents because nonresidents were not liable for certain other taxes within the state); *Davis v. Franchise Tax Bd.,* 71 *Cal.App.* 3d 998, 139 *Cal.Rptr.* 797, 799 (Ct.App.1977) (sustaining California income tax provision permitting only residents to utilize income averaging statute on the grounds that "the nonresident could display a fluctuating California income as a cloak for non-fluctuating total income"), dismissed for want of substantial federal question, 434 *U.S.* 1055, 98 *S.Ct.* 1222, 55 *L.Ed.*2d 755 (1978); *Anderson v. Tiemann,* 182 *Neb.* 393, 155 *N.W.*2d 322 (1967) (sustaining a statute permitting only residents to take food sales tax expenses as a credit under the Nebraska income tax for the reason that the credit concerned personal or nonincome-producing activities closely related to the state of residence), dismissed for want of substantial federal question, 390 *U.S.* 714, 88 *S.Ct.* 1418, 20 *L.Ed.*2d 254 (1968); *Berry v. State Tax Comm'n,* 241 *Or.* 580, 397 *P.*2d 780 (1964) (affirming the propriety of a provision under the Oregon income tax law that allowed only residents to deduct certain personal expenses related to their place of residency, on the grounds that the provision was part of a statutory scheme that recognized the tax problems created by interstate investors and commuters and that the personal deductions were so closely related to the state of residence that they may be limited to residents of the state), dismissed for want of substantial federal question, 382 *U.S.* 16, 86 *S.Ct.* 57, 15 *L.Ed.*2d 12 (1965); *Wheeler v. State,* 127 *Vt.* 361, 249 *A.*2d 887 (affirming progressive tax structure that imposed upon nonresidents a tax determined from the nonresident's total income rather than the nonresident's Vermont income, because the nonresident was not thereby disadvantaged compared to Vermont residents), dismissed for want of substantial federal question, 396 *U.S.* 4, 90 *S.Ct.* 24, 24 *L.Ed.*2d 4 (1969).

### III

The imposition of a tax on the New York commuter affects a fundamental activity protected by the Privileges and Immunities Clause, the pursuit of a livelihood. *See Hicklin v. Orbeck, supra; Mullaney v. Anderson, supra; Toomer v. Witsell, supra, Ward v. Maryland, supra.* Prohibiting nonresidents from using state roads would affect the nonresident's freedom to trade or to operate a business or to work in an adjoining state. Indeed, the Clause "bar[s] a State from penalizing the citizens of other States by subjecting them to heavier taxation merely because they are such citizens or by discriminating against citizens of other States in the pursuit of ordinary livelihoods in competition with local citizens." *Toomer v. Witsell,* 334 *U.S.* at 408, 68 *S.Ct.* at 1168, 92 *L.Ed.* at 1477 (Frankfurter, J., concurring).

In *Salorio I* we acknowledged that the ETT tax discriminated against the New York resident. The following example illustrates that discrimination. Consider three persons each with income of $25,000 [6] when

(a) one person resides in New Jersey and his income is entirely derived from sources within New Jersey;

(b) one person resides in New Jersey and his income is entirely derived from sources within New York; and

(c) one person resides in New York and his income is entirely derived from sources within New Jersey.

The total New Jersey income tax liability for a person under the above hypothetical conditions is:

---

[6]In all three cases it is assumed that taxpayer's income is entirely includable as personal service income, see *N.J.S.A.* 54:8A–6.4, and that taxpayer had no losses in the taxable year, is single and was never married, is under age 65, has no children, had no uncompensated medical expenses, lives alone and does not reside in a rented dwelling.

|                              | (a)       | (b)   | (c)        |
|------------------------------|-----------|-------|------------|
| New Jersey Gross Income Tax [7] | $500.00   | $ 0   | $ 500.00   |
| ETT [8]                      | 0         | 0     | 1030.00    |
| Total                        | $500.00   | $ 0   | $1530.00   |

The comparison for privileges and immunities purposes must be made between the classes of persons who earn New Jersey income, namely, the New Jersey resident with New Jersey income (example (a)) and the New York commuter with New Jersey income (example (c)). *See Austin v. New Hampshire,* 420 *U.S.* at 666, 95 *S.Ct.* at 1197, 43 *L.Ed.*2d at 538. The issue does not relate to a comparison of New York's tax on New Jersey's residents with New Jersey's tax on New York residents. Rath-

---

[7] Under the New Jersey Gross Income Tax, the "gross income" of all three taxpayers is equal to total income minus a $1,000 exemption. *N.J.S.A.* 54A:3–1. The tax is calculated as $400 plus 2.5% of the excess over $20,000. *N.J.S.A.* 54A:2–1. Only taxpayer "b" is allowed a credit for his entire Gross Income Tax liability because his total income was subject to New York income tax, under which his liability was in excess of $500. *N.J.S.A.* 54A:4–1.

[8] Taxpayer "a" is not subject to the ETT. *N.J.S.A.* 54:8A–2. Taxpayer "b" is allowed a credit against the ETT for the amount of the income tax paid to New York that is based on New York income. *N.J.S.A.* 54:8A–16(B). Taxpayer "c" is not entitled to a credit against the ETT because New York neither grants a "substantially similar credit" to New Jersey residents nor exempts New Jersey residents from the New York income tax. *N.J.S.A.* 54:8A–16(A). Taxpayer "c"'s taxable income ($21,700) is equal to his total income ($25,000) minus a standard deduction ($2,500), *N.J.S.A.* 54:8A–9, and one exemption ($800), *N.J.S.A.* 54:8A–10. The tax is calculated from the statutory tax table, *N.J.S.A.* 54:8A–6, as $1,060, plus 10% of the excess over $17,000, *N.J.S.A.* 54:8A–6.4, or $470.

An individual subject to the Gross Income Tax is liable only for a sum equal to the amount of tax due and payable under the Gross Income Tax or the ETT, whichever is greater. *N.J.S.A.* 54:8A–119. Accordingly, the amount otherwise paid into the Transportation Fund is reduced by the amount otherwise due and payable under the Gross Income Tax.

er, the issue involves New Jersey's tax on income of its residents and nonresidents.

The argument is made that the New York commuter's ultimate burden is unchanged because of the tax credit received in New York for the ETT and that therefore the Privileges and Immunities Clause is not violated. That contention was rejected by the Supreme Court in *Austin v. New Hampshire*. There the Court stated that the possibility that Maine, like New York in this case, could shield its residents from New Hampshire's tax, like New Jersey's ETT, does not cure the constitutional defect but "in effect invites [nonresidents] to induce their representatives, if they can, to retaliate against it." 420 *U.S.* at 667, 95 *S.Ct.* at 1198, 43 *L.Ed.*2d at 538. The Court quoted the following language from *Travis v. Yale & Towne Mfg. Co.*, 252 *U.S.* 60, 82, 40 *S.Ct.* 228, 232, 64 *L.Ed.* 460, 470 (1920):

New York has no authority to legislate for the adjoining States; and we must pass upon its statute with respect to its effect and operation in the existing situation .... A State may not barter away the right, conferred upon its citizens by the Constitution of the United States, to enjoy the privileges and immunities of citizens when they go into other States. Nor can discrimination be corrected by retaliation; to prevent this was one of the chief ends sought to be accomplished by the adoption of the Constitution. [420 *U.S.* at 667, 95 *S.Ct.* at 1198, 64 *L.Ed.*2d at 539]

The State's justification for the differential imposed on the nonresident is that his commuting has created a need for additional facilities to meet the commuting crunch between New York and New Jersey during certain peak hours in the morning and afternoon. That being so, the expenditures attributable to the New York-to-New Jersey commuter should be borne by him. If true, it follows that the nonresident commuter could be required to pay up to an approximation of those expenditures. The charge imposed upon the commuter on the basis of benefits he derived from the use of those transportation facilities may have no relationship to the costs and would therefore violate the principle that there must be a "substantial relationship" be-

tween the problem and the discrimination.[9]

The peak commuting travel periods are from 7:00 a.m. to 10:00 a.m. and 4:00 p.m. to 7:00 p.m. It is this demand in those periods that the State has attempted to satisfy by expanding transportation facilities and expanding bus and train service. New York commuters have constituted a small proportion of the total interstate and intrastate commuter volume—3.5% in 1960, 2.9% in 1970 and 4.0% in 1980. New Jersey to New York commuters substantially outnumber those travelling from New York to New Jersey. The following chart demonstrates that fact:

| Journey to Work, Within, From and to New Jersey— All Modes | 1960 | | 1970 | | 1980 | |
|---|---|---|---|---|---|---|
| | Number of Trips | Percent of Total | Number of Trips | Percent of Total | Number of Trips | Percent of Total |
| New Jersey – New Jersey | 1,341,396 | 85.2% | 1,839,966 | 86.7% | 1,938,883 | 86.3% |
| New Jersey – New York | 177,459 | 11.3% | 221,300 | 10.4% | 226,674 | 9.7% |
| New York – New Jersey | 55,049 | 3.5% | 62,018 | 2.9% | 90,157 | 4.0% |
| Total | 1,573,904 | 100.0% | 2,123,284 | 100.0% | 2,255,714 | 100.0% |

Although the State has not shown that New York commuters cause higher average costs per commuter than New Jersey

---

[9]Some misunderstanding arose because of certain language in *Salorio I* with respect to the admeasurement of the New Yorker's fair share of the costs of the transportation facilities. It was and is our opinion that the State may exact from the New York resident "a fair share of the cost of adequate transportation facilities," 82 *N.J.* at 506, and that the nonresidents are chargeable "to the extent of their contribution to the transportation problem," *id.* at 508–09. We referred to the "additional expenses occasioned by their activities within the state, or on account of the reasonable costs of benefits which they receive from the state." *Id.* at 503. Our references to *"benefits"* in *Salorio I* were to the costs of those benefits.

We afforded the State an opportunity after oral argument to produce additional evidence, but it asserted "that the present record contains all available date which would be pertinent to a cost allocation for the New York to New Jersey commuting class."

commuters, the New York commuter does exacerbate the peak load. Accordingly, both incremental and average costs are pertinent factors in determining the costs attributable to the New York commuter.

According to one of the State's experts, whose testimony the trial court accepted, New York commuters are responsible for only 3% to 3.7% of highway expenditures allocable to the commuting class, 3% to 4% of railroad subsidies by the State, and 15% of bus-operating subsidies by the State. The allocation of 15% of the bus subsidy is suspect because in 1980 New York bus commuters constituted only 7½% of total interstate bus commuters and less than 2½% of combined interstate and intrastate bus commuters. The trial court summarized the expert's factual analysis as follows:

> Simpson and Curtin also included a compilation of State expenditures for mass transit during the study period. They next defined the 10-county study area and then allocated State expenditures to the area. First they noted that northern New Jersey had 75% of the expenditures during the 1960's and 1970's and contained 55% of the total route mileage within the State. The 55% was increased by 15% because the road width is greater in northern New Jersey by 20 to 25% than in south Jersey. Finally another 15% was added since construction and maintenance costs for highways run 10–25% higher in the northern 10 counties, in part because of higher cost of living and union wage scales. Therefore, Simpson & Curtin allocated 75% of all State highway expenditures in the 1960's and 70% of the 1970 expenditures to the study area.

> Proceeding to the five categories of study, Simpson & Curtin allocated 96% of highway construction and right-of-way costs to commuter travel, as well as 90% of the maintenance. (100% of the transit subsidies were allocated to commuters). This is based in part on the preceding calculations together with Mr. Curtin's testimony that highways are designed for the thirtieth highest hourly volume [in the year], which just happens to fall in the peak period. Defendant states that most of the highway network was built prior to the 1960's and what was needed in the 1960's and 1970's was merely the "widening and improving" of these roadways to accommodate the commuter.

> The final step in the Simpson & Curtin report was to allocate the expenditures to the New York commuter. Utilizing a variety of sources, Simpson & Curtin determined that during the 1960's, 3% and during the 1970's 3.7% of all highway commuters were New York commuters. 15% of all bus commuters were said to be New York commuters since that percentage of buses left New York during the morning peak and arrived in New York during the evening peak period. Consequently, 15% of the operating and capital subsidies were allocated to the New York commuter, because "equipment utilization is the indicator of operat-

ing costs and not passengers carried." Total State transportation expenditures attributable to the New York commuter over the 20-year period were $255,299,-111 or $182,973,042, omitting the federal assistance. Both numbers are significantly lower than the $380,634,000 in tax collected.

The plaintiffs have disputed nearly every element of the State's allocation of expenditures. However, even if these allocation charges are not overstated, the tax must fall because it fails that part of the *Hicklin* test requiring a substantial relationship between the tax imposed on New York nonresident commuters and the burden imposed by them on New Jersey's transportation system. According to the records of the Department of Treasury, Division of Budget and Accounting, as submitted by the State's expert, Simpson & Curtin, the ETT tax generated a total of $500 million from the fiscal year 1962 through fiscal year 1980, of which $112 million were transferred to the Property Tax Relief Fund. Net ETT receipts after cost of collection were $381 million. The State's experts concluded that "each year the tax has exceeded the New Yorker's share of transportation costs." Over two decades the costs have totalled $182 million, approximately 48% of the $381 million charge imposed. According to the evidence submitted by the State's expert, this disparity has continued unabated in the tax years following the effective date of the Gross Income Tax:

|  | ETT Receipts (excluding refunds, cost of collection, and transfers to Property Tax Relief Fund) | Transportation Cost Burdens allocable to New York-Based Commuters (excluding Federal Assistance) | Ratio of Transportation Cost Burdens (Column 2) to ETT Receipts (Column 1) |
|------|------|------|------|
| 1977 | $29,899* | $13,576* | 45% |
| 1978 | 20,334 | 14,551 | 72% |
| 1979 | 34,630 | 13,534 | 39% |
| 1980 | 33,865 | 14,088 | 42% |

*Dollars in Thousands

We find that the relationship between net ETT receipts and transportation costs allocable to New York-based commuters over the entire life of the tax and during recent years is too disparate to withstand constitutional challenge.

## IV

We are not concerned with a broad-based revenue scheme. Thus, the portion of the ETT collection remitted to the Property Tax Relief Fund under the New Jersey Gross Income Tax is not at issue. Instead what is involved is that part of the ETT tax that is allocated to the Transportation Fund and used for transportation measures to alleviate the commuter transportation problems caused by the severe peak-load demands during usual commuter hours. In connection with the enactment of the gross income tax in 1976, the Legislature reduced the ETT liability by the amount due and payable under the New Jersey Gross Income Tax Act. *L.*1976, *c.* 66 (codified at *N.J.S.A.* 54:8A–119 to –121). New York residents are subject to disparate income tax treatment only for the ETT liability in excess of the amount due under the New Jersey Gross Income Tax. We are concerned with only this excess tax liability.

No one questions the legitimacy of imposing the New Jersey Gross Income Tax on the income earned in New Jersey by nonresidents. It is well-established that a state may constitutionally impose a tax on nonresidents' income derived from sources within the state. *Shaffer v. Carter,* 252 *U.S.* 37, 40 *S.Ct.* 221, 64 *L.Ed.* 445 (1920); *see Austin v. New Hampshire,* 420 *U.S.* at 664–65, 95 *S.Ct.* at 1196–1197, 43 *L.Ed.*2d at 537; *see also* Hellerstein, "Some Reflections on the State Taxation of a Nonresident's Personal Income," 72 *Mich.L.Rev.* 1309, 1312, 1318 (1974). Plaintiffs' entire tax liability under the general gross income tax is not involved. *N.J.S.A.* 54A:5–5, –8.

## V

There remains for consideration the appropriate relief to be afforded. Plaintiffs seek a judgment declaring the statute

unconstitutional, enjoining enforcement of the act, and awarding them damages on the basis of taxes paid.[10]  Because we have found the ETT to violate the Privileges and Immunities Clause, plaintiffs are entitled to a declaratory judgment.  Plaintiff's theory for reimbursement of the ETT taxes paid is the traditional one:  an unconstitutional act is void from its inception and everything done thereunder must be undone.  The modern view is that invalidation of a statute does not automatically invalidate all prior transactions made in justifiable reliance upon the statute.  *Compare Norton v. Shelby County,* 118 *U.S.* 425, 6 *S.Ct.* 1121, 30 *L.Ed.* 178 (1886), *with Lemon v. Kurtzman (Lemon II),* 411 *U.S.* 192, 93 *S.Ct.* 1463, 36 *L.Ed.*2d 151 (1973). " '[T]he federal constitution has no voice upon the subject' of retrospectivity." *United States v. Johnson,* —— *U.S.* ——, ——, 102 *S.Ct.* 2579, 2583, 73 *L.Ed.*2d 202, 208 (1982) (quoting *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.,* 287 *U.S.* 358, 364, 53 *S.Ct.* 145, 148, 77 *L.Ed.* 360, 366 (1932)).  It is important to recognize that we are acting within the framework of appropriate equitable relief with respect to an unconstitutional taxation statute and not with regard to the retrospective effect of a new rule of criminal procedure, *United States v. Johnson,* —— U.S. ——, 102 *S.Ct.* 2579, 73 *L.Ed.*2d 202 (1982); or a substantive constitutional principle, *United States v. United States Coin & Currency,* 401 *U.S.* 715, 91 *S.Ct.* 1041, 28 *L.Ed.*2d 434 (1971);  or a rule of judge-made law applicable to civil proceedings, *Mirza v. Filmore Corp.,* 92 *N.J.* 390 (1983);  *Cogliati v. Ecco High Frequency Corp.,* 92 *N.J.* 402 (1983).  Factors that may be relevant in the criminal field, such as integrity of the judicial process, impairment of the basic purpose of the jury to determine the truth, or in the common law in civil matters in

---

[10]A pending class action, seeking the same relief, has been stayed until final determination of all issues in *Salorio v. Glaser.  Yowell v. Glaser,* No. C–2910–77 (Ch. Div., Bergen County, Oct. 16, 1978 (order staying proceedings)).

which other policy considerations are involved, may or may not be applicable here.

*Lemon II* is particularly instructive. The United States Supreme Court had held unconstitutional a Pennsylvania statute under which the Commonwealth of Pennsylvania reimbursed private sectarian schools for certain secular educational services. *Lemon v. Kurtzman (Lemon I)*, 403 *U.S.* 602, 91 *S.Ct.* 2105, 29 *L.Ed.*2d 745 (1971). Issues then arose with respect to reimbursement of funds previously paid and to the future payment for services rendered before the opinion declaring the act unconstitutional. The District Court enjoined payments for services rendered after the Supreme Court's decision on June 28, 1971, but permitted the State to pay the schools for services provided before. The Supreme Court affirmed.

Chief Justice Burger, writing for the Court, stated that retroactivity depended upon a consideration of the particular relations between and conduct of the parties, of rights that had vested, of status, of prior determinations deemed to have finality, and of public policy. He stressed that statutory law is a "hard fact[ ] on which people must rely in making decisions and in shaping their conduct." 411 *U.S.* at 199, 93 *S.Ct.* at 1468, 36 *L.Ed.*2d at 160. He also noted that the problem before the Court was "essentially one relating to the appropriate scope of federal equitable remedies, a problem arising from enforcement of a state statute during the period before it had been declared unconstitutional." *Id.*, 411 *U.S.* at 199, 93 *S.Ct.* at 1469, 36 *L.Ed.* 2d at 161. Equitable remedies, he wrote, "are a special blend of what is necessary, what is fair, and what is workable." *Id.* at 200, 93 *S.Ct.* at 1469, 36 *L.Ed.*2d at 161 (footnote omitted).

"[R]eliance interests weigh heavily in the shaping of an appropriate equitable remedy." *Id.* at 203, 93 *S.Ct.* at 1471, 36 *L.Ed.* 2d at 163; *see also Chevron Oil Co. v. Huson*, 404 *U.S.* 97, 92 *S.Ct.* 349, 30 *L.Ed.*2d 296 (1971). This is particularly so in this case where invalidation of the ETT tax blocks a source of revenue heretofore available to the state. Our holding today is

the equivalent of a new rule of law. *Cf. State v. Burstein,* 85 *N.J.* 394, 406 (1981). Under these circumstances, as Judge Conford expressed in *Oxford Consumer Discount Co. v. Stefanelli,* 104 *N.J.Super.* 512, 520 (App.Div.1969), aff'd, 55 *N.J.* 489 (1970):

> There is no question but that appellate courts in this State and elsewhere have long regarded themselves as empowered and justified in confining the effect of a decision of first impression or of novel or unexpected impact to prospective application if considerations of fairness and justice, related to reasonable surprise and prejudice to those affected, seemed to call for such treatment.

Foremost among the factors to be considered is the State of New Jersey's justifiable reliance upon the availability of the ETT funds. We have consistently and frequently advised that a duly enacted statute is presumptively valid. The officials, legislative and executive, were entitled to rely on that presumption. Further, some consideration should also be given to the reciprocal arrangement made between New York and New Jersey in 1962. New York was to allow its residents a credit for payments under the ETT and New Jersey would grant its residents a credit against ETT for income taxes paid to New York. Though we questioned the validity of the accord under the Compact Clause of the federal constitution, *U.S. Const.,* art. I, § 10, cl. 3; see 82 *N.J.* at 512, we did not rule out the possibility that "[r]eciprocally favorable treatment of non-residents [may] not violate the Privileges and Immunities Clause," if the accord were interpreted to bind New York's power to extend tax credits to its residents. *Id.* at 513 (quoting *Austin v. New Hampshire,* 420 *U.S.* at 667 n. 12, 95 *S.Ct.* at 1198 n. 12, 43 *L.Ed.* 2d at 539 n. 12).

The legislative and the executive branches of government have relied on the ETT for many years in preparation of budgets, with respect to both income and expenditures, and in making appropriations and expenditures. The expenditures cannot be undone and reimbursement would have a substantial effect on the State's existing financial requirements. Public fiscal stability is at issue.

Furthermore, no one challenged the ETT until June 1977, fifteen years after the ETT was enacted. Nor did the plaintiffs seek interim injunctive relief during the pendency of this action, presumably because their right to relief was not clear. *See Citizens Coach Co. v. Camden Horse R.R. Co.*, 29 *N.J.Eq.* 299 (E. & A.1878). It is of considerable moment that the plaintiffs have suffered no financial harm because they have received a credit for the amount paid to New Jersey against their New York income tax. Under these circumstances, we believe that reimbursement is not warranted.

The course of non-retroactivity when invalidating public revenue raising measures is not without precedent. In *Hurd v. City of Buffalo*, 41 *A.D.*2d 402, 343 *N.Y.S.*2d 950 (1973), aff'd, 34 *N.Y.* 2d 628, 311 *N.E.*2d 504, 355 *N.Y.S.*2d 369 (1974), the New York Court of Appeals permitted the City of Buffalo to retain monies collected under an ordinance violative of the State Constitution because "the fact is that the City has relied on the additional taxes which it was able to impose because of the statute, and has spent the revenues derived thereby." 41 *A.D.*2d at 405, 343 *N.Y.S.*2d at 953. The City was also permitted to retain amounts paid under protest after the Appellate Division opinion declaring the tax invalid. *Pellnat v. City of Buffalo*, 59 *A.D.*2d 1038, 399 *N.Y.S.*2d 788 (1977).

The Supreme Court of Florida struck down a statute authorizing school districts to levy *ad valorem* taxes but refused to order refunds in view of the defendant school board's good faith reliance on a presumptively valid statute and the budgetary and administrative burdens a refund would cause. *Gulesian v. Dade County School Bd.*, 281 *So.*2d 325 (Fla.1973); *accord, International Studio Apartment Ass'n v. Lockwood*, 421 *So.*2d 1119, 1123 (Fla.App.1982) (unconstitutionality of statute providing that interest earned on funds deposited with court clerk belongs to clerk's office held effective prospectively only, in light of "injustice and hardship on the clerk and county by mandating the return of monies long since expended"). The Michigan Supreme Court in *Hays v. Regents of the Univ. of Michigan*, 393

*Mich.* 756, 223 *N.W.*2d 276 (1974) (modifying 53 *Mich.App.* 605, 220 *N.W.*2d 91), held that, despite the invalidity of a state tuition, no refund need be made concerning semesters preceding the commencement of the suit.

Many factors that justify our refusal to grant reimbursement are equally applicable in determining the effective date of our opinion. The State has anticipated and collected ETT revenues for more than twenty years. At present those revenues exceed $30,000,000 per year. They are an established part of New Jersey's budget and are related to expenditures used for the public welfare, including transportation projects that benefit New York residents such as the plaintiffs. Elimination of this source of revenue will require a reduction in expenditures, or an increase in alternative revenues, or creation of new taxes, or some combination of the foregoing. The State's fiscal year ends June 30, 1983 and the budget for the ensuing year must be in place by that date. Given today's budgetary constraints, the competing interests for funds for many worthwhile purposes, and the difficulty in enacting additional taxes, it is unrealistic to expect that the Legislature and Executive will reasonably be able to resolve the best method of dealing with the anticipated loss by that time. Moreover, there are administrative problems to be attended to upon the effectiveness of this decision. For example, many employers will be required to modify deductions from wages and salaries and make changes in their payroll systems. Furthermore, as previously observed, the plaintiffs will not suffer any financial loss from a prospective date, because they will continue to receive a full credit against their New York income tax for the ETT tax paid.

We are persuaded to fix a prospective date because of our concern for the fiscal and administrative problems that would be engendered if the State were compelled to surrender ETT receipts before the end of the fiscal year. The State should be afforded a reasonable period of time to devise alternative revenue raising methods, abandon or postpone transportation projects or consider some other suitable solutions. We believe

that relief against enforcing the ETT tax with respect to income earned on and after January 1, 1984 will accommodate these concerns.[11] This date is also coordinate with the fiscal year of most individuals and will permit employers and employees sufficient opportunity to solve any bookkeeping or related problems.

The procedure we have adopted accords with relief that we have afforded the Legislature or other governing bodies in comparable cases, providing the opportunity to devise alternative funding schemes. *See Pascucci v. Vagott,* 71 *N.J.* 40 (1976) (holding effectiveness of invalidity of general assistance benefit schedule postponed for at least "60 days from the date of the filing of this opinion ... to accommodate and give time for solution of legislative, executive or administrative problems"); *Robinson v. Cahill,* 62 *N.J.* 473, 520–21 (1973) (declaring State system of financing public education to be unconstitutional and stating that because "some period of time will be needed to establish another statutory system, obligations hereafter incurred pursuant to existing statutes will be valid in accordance with the terms of the statutes"); *Borough of Neptune City v. Borough of Avon-by-the-Sea,* 61 *N.J.* 296, 310–11 (1972) (holding illegality of higher beach fee charged nonresidents than residents not to be retroactive because "Avon very likely has operated its budget and financial affairs on the basis of the beach user fees expected to be collected under the present schedule in reliance upon the trial court decision [sustaining the ordinance]"); *see also Switz v. Middletown Twp.,* 23 *N.J.* 580, 598 (1957) (compelling municipal assessor to value and assess all taxable real property at full and fair value in compliance with state constitution, effective in three years "to afford the Legislature the opportunity to take such measures and provide for such administrative procedures as its own inquiry may prove to

---

[11]In passing we note that roughly half of the ETT tax would be justifiable when related to the costs.

be essential to the public interest and to allow the Township [the] time needed" to effectuate revaluation program); *Hellerstein v. Assessor of Town of Islip,* 37 *N.Y.*2d 1, 14, 332 *N.E.*2d 279, 387, 371 *N.Y.S.*2d 388, 399 (1975) (holding invalid real property assessment for tax purposes in June 1975 to be corrected within "a reasonable time, but not later than December 31, 1976"), modified, 39 *N.Y.*2d 920, 352 *N.E.*2d 593, 386 *N.Y.S.*2d 406 (1976) (postponing effective date until July 1, 1978).

We are not unmindful of our broad discretionary power in the balancing of all hardships and equities in shaping an equitable decree. "Equity courts have often recognized matters of public policy, convenience of administration, and practicality as matters to be weighed in the scales along with the matters of justice and morality." D. Dobbs, *Remedies* 56 (1973). Prospectivity illustrates the principle that equitable remedies "are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties." 1 J. Pomeroy, *Equity Jurisprudence* § 109, at 122–23 (4th ed. 1918), quoted approvingly in *Sears, Roebuck & Co. v. Camp,* 124 *N.J.Eq.* 403, 411–12 (E. & A.1938). Accordingly, prospectivity has been utilized to reach equitable results. Thus, as previously noted, the United States Supreme Court in *Lemon II* approved a decree entered in accordance with traditional equity powers compelling Pennsylvania to make a payment under an unconstitutional statute.

The judgment of the trial court is reversed, and the matter is remanded to that court for entry of judgment in accordance with this opinion. Jurisdiction is not retained.

*For reversal and remandment—*

Chief Justice WILENTZ, Justices CLIFFORD, SCHREIBER, GARIBALDI and SULLIVAN and Judges MATTHEWS and FRITZ—7.

*For reversal—*None.